# CORDIA SMALLWOOD, Respondent, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.*

In the Kansas City Court of Appeals, May 5, 1924.

1. **RELEASE: Under Evidence, Question of Whether Plaintiff was of Such Condition of Mind as not to Understand Nature and Quality of her Act in Signing Release, Held for Jury.** Question of whether plaintiff at time she signed release, was of such condition of mind as not to understand the nature and quality of her act, or to realize the antagonistic position of her adversary, or to cope with him in making a bargain, *held* for the jury.

2. **EVIDENCE: Judicial Notice: Court Will not Judicially Notice that Signing of Release with Left Hand by Right-Handed Person Requires Full Possession of Mental Faculties.** Court will not take judicial notice that signing of release with left hand by right-handed person requires full possession of the mental faculties.

3. **RELEASE: Ratification: Fraud: Ratification or Adoption of Settlement Procured by Fraud Held for Jury.** Whether plaintiff ratified or adopted settlement evidenced by release obtained by fraud, by using a portion of the money paid to husband, who deposited the same to their joint account, *held* for jury.

4. **———: Fraud: Tender: Where Fraud Inheres in Procurement of Release, no Tender Back of the Consideration is Necessary.** Where fraud inheres in the procurement of release no tender back of the consideration is necessary.

5. **APPEAL AND ERROR: Testimony Treated by Defendant at the Trial as Immaterial Will be so Considered on Appeal.** Testimony treated by defendant at the trial as immaterial, will be so considered on appeal.

6. **RELEASE: Evidence as to Financial Difficulties of Plaintiff's Husband at Time Purported Release was Signed Held Admissible on Issue of Fraud in Procurement Thereof.** Evidence as to financial difficulties of plaintiff's husband which were known to claim agent of defendant who negotiated with him for settlement of plaintiff's claim for injuries, *held* admissible on issue as to whether plaintiff was overreached by claim agent at time purported release was signed.

7. **APPEAL AND ERROR: Inferences: Upon Consideration of Demurrer to Plaintiff's Evidence, Inferences Will not be Drawn in Favor of Defendant.** In determining whether demurrer should have been sustained to plaintiff's evidence, inferences from the evidence will not be drawn in favor of defendant.

8. **RELEASE: Claim Agent's Knowledge of Mental Incapacity of Plaintiff to Execute Release Held for Jury.** Whether defendant's claim agent in obtaining release of plaintiff's claim, for consideration agreed to by her husband, who was a man of no great intelligence, in financial difficulties and under compulsion to make settlement, realizing mental incapacity of plaintiff by reason of her injuries, to sign release, and whether he was justified in relying upon her husband to properly protect her interests, *held* for the jury.

9. **EVIDENCE: Conclusion: Witness Held Qualified to State Her Conclusion as to Plaintiff's Mental Capacity.** Where evidence showed that witness was in constant attendance upon plaintiff from time of injury, and described plaintiff's condition generally, that she was in a stupor, and efforts of claim agent to talk to plaintiff, etc., *held* properly qualified to state her conclusion as to plaintiff's mental capacity.

10. **INSTRUCTIONS: Negligence: Instruction Held not Misleading as Submitting Duty of Railroad to Sound Whistle, Which was not Required by Law at Place of Injury.** An instruction to find for plaintiff if employees operating train negligently failed to ring any bell or sound whistle, and failed to give any kind of warning whatever of approach of engine to crossing, *held* not misleading as submitting duty of defendant to sound whistle, which it was not obligated to do within city limits.

11. ———: ———: **Instruction on Failure to Give any Kind of Warning Held not Limited to Negligence in Failing to Establish Electrical Signal Device, Where no Such Claim was Made.** An instruction to find for plaintiff, if employees operating train failed to give "any kind of warning whatever" of approach of engine, *held* not limited to negligence in failing to establish electrical signal device at crossing, particularly where no claim of such failure was being made by plaintiff.

12. ———: ———: **Instruction Submitting Negligence of Defendant Railroad Generally in Failing to Give Warning Without Mentioning Employees, Held not Erroneous.** An instruction submitting negligence of defendant's employees as proximate cause of injury, while failing to give any kind of warning of approach of engine, is charged to defendant generally without mentioning employees,

217 Mo. App.—14.

*held* not erroneous as defendant being a corporation could only do or fail to do any specific thing through its employees.

13. **NEGLIGENCE:** Proximate Cause: Whether Speed of Train in Violation of Ordinance was Proximate Cause of Injury at Street Crossing Held for Jury. Whether operation of train at a speed in excess of six miles an hour in violation of ordinance was proximate cause of injury to plaintiff, a passenger in automobile struck at crossing, *held* for jury.

14. **RELEASE:** Instruction as to Adoption of Release and Settlement if Plaintiff ''Permitted'' Her Husband to Use Money Paid in Consideration of Release, Held Too Broad. An instruction that plaintiff, by signing release and retaining consideration paid, adopted release and settlement of cause of action against defendant if she used or "permitted" her husband to use money paid to them jointly, *held* too broad as authorizing jury to find that plaintiff adopted release if she merely suffered her husband to use money by making no objection thereto, whether she thought such an objection would be effective or not, especially in view of husband's equal right to money.

15. ————: Act Giving Rise to Inference That Plaintiff Intended Ratification Necessary to Show Adoption of Release Procured by Fraud. Plaintiff could not be held to have adopted a release procured by fraud, unless some unequivocal act was shown upon her part, giving rise to inference that she intended her conduct to amount to a ratification, or that reasonable minds would say that she was guilty of some act tending to show that she must have intended an adoption of the contract.

16. **INSTRUCTION:** Instruction That Release was Void if Defendant's Claim Agent Knew Plaintiff's Mental Condition at Time of Execution of Release, Held Proper, Though it Might Have Been in Conflict with Defendant's Instruction. An instruction predicating a finding that release was void upon a mere showing that claim agent knew plaintiff's mental condition at the time he procured her signature to it, *held* not erroneous, though there might have been a conflict between said instruction and one of defendant's authorizing a finding for it if draft covering consideration for release was endorsed by plaintiff and paid by defendant.

*Headnotes 1. Release, 34 Cyc., p. 1106; 2. Evidence, 23 C. J., Section 1969 (Anno); 3. Release, 34 Cyc., p. 1106; 4. Release, 34 Cyc., p. 1074 (Anno); 5. Appeal and Error, 3 C. J., Section 628; 6. Release, 34 Cyc., p. 1102; 7. Appeal and Error, 4 C. J., Section 2708; 8. Release, 34 Cyc., p. 1106; 9. Evidence, 22 C. J., Section 696; 10. Railroads, 33 Cyc., p.

1137; 11. Railroads, 33 Cyc., p. 1133; 12. Railroads, 33 Cyc., p. 1142; 13. Railroads, 33 Cyc., p. 1128; 14. Release, 34 Cyc., p. 1107; 15. Release, 34 Cyc., p. 1065; 16. Trial, 38 Cyc., p. 1607.

Appeal from Circuit Court of Jackson County.—*Hon. O. A. Lucas*, Judge.

AFFIRMED.

*W. F. Evans, Guthrie & Conrad* and *Hale Houts* for appellant.

*C. R. Leslie* and *Hogsett & Boyle* for respondent.

BLAND, J.—This is an action for damages for personal injuries. There was a verdict and judgment in favor of plaintiff in the sum of $7500 and defendant has appealed.

The facts show that plaintiff was injured while riding in an automobile being driven by her husband on the evening of June 22, 1920, at a point within the limits of Kansas City, Missouri, where 25th Street is intersected by defendant's railway. The automobile was on 25th Street, crossing toward the east, when it was struck by one of defendant's north-bound freight trains, throwing the car upon the pilot of the engine and pinning plaintiff against the pilot and the wreckage of the car. She was in this position while the train ran about 175 feet. The negligence in the petition is based upon the failure of defendant to sound a whistle or ring a bell within a distance of eighty rods from the crossing, and also running the train in excess of six miles per hour, the speed limit prescribed by an ordinance of Kansas City. The evidence shows that the train was going from ten to fifteen miles an hour.

The answer consists of a general denial and a plea of contributory negligence and alleges that on the 21st day of July, 1920, in consideration of the sum of $1300 paid her by the defendant, plaintiff executed a release of

her cause of action; said release is alleged to have been in writing and a verified copy of the same was attached to the answer. The reply consists of a general denial and alleges that if plaintiff signed a paper purporting to be a release, she had no knowledge of the contents of the same on account of her weak and defective mental condition at the time of such alleged signing and on account of such condition she did not understand anything concerning the legal effect of such signing and had no understanding of the nature and quality of her act, and if she signed the paper referred to in defendant's answer, it was procured by the fraud of defendant's agent in that it was procured at a time when they had reason to believe and did believe that she was not mentally capable of making a contract. Plaintiff further alleged in her reply that if she signed the purported release, it was under the influence of drugs and opiates administered to her by a physician to prevent intolerable suffering, and that these drugs and opiates and suffering affected her mind so that "she was in a stupor and mentally incapable of entering into a contract."

Defendant insists that its instruction in the nature of a demurrer to the evidence should have been given. This point is not based upon any contention that defendant was not originally liable for plaintiff's injuries but entirely upon the circumstance of the execution of the release. In the first place it is insisted that there was insufficient evidence of a lack of mental capacity on the part of plaintiff at the time she signed the release. The facts in this connection show that when the engine was removed plaintiff was found to be unconscious and was taken in this condition to her home in Kansas City. A physician was immediately called who found plaintiff unconscious and with a pulse so fast it could not be counted; that she was cold and had a clammy skin caused by a sweat; that she was swollen and had hemorrhages under the skin; that the veins were torn and that she had bruises on her arm, hand, shoulder, right side, hip, face,

and head and a wound on her scalp that extended to the bone. She suffered from a concussion of the brain.

The evidence shows that plaintiff's right cheek bone, collar bone, right shoulder blade, the bones of four fingers on the right hand and several ribs on each side were broken; that the pelvis bone was broken twice and at the time of the trial she had a knot on it as large as a bird's egg; that her right limb was two inches shorter than her left. The evidence shows that for a period of six days, excluding June 24th and 25th, she was given hypodermic injections of morphine and again on July 3rd, and from July 4th to and including July 8th she was given bromides, and from July 14th to and including the 25th, except on the 20th and 24th, she was given capsules of codeine. These capsules contained 12 decigrams to 12 capsules, or 1/6th of a grain to a capsule. There was medical testimony to the effect that these drugs, together with the pain and suffering that plaintiff endured as the result of her injuries, would affect her mental processes at the time she signed the release. In addition to direct evidence of plaintiff's mental condition when she signed the purported release on the 21st of July, there was testimony by friends who saw her, some before and some after that day and others at both times, that her talk was irrational from the time she was injured until after the day of the signing of the release; that she acted "like somebody drunk;" that she was not apparently rational on any day for five weeks after her injury; that she would look at a witness whom she knew and ask "is that Frank" (her husband) or would call him by the name of her son; that a part of the time she was in a stupor, "talked in a rather unbalanced manner" and seemed to be dopey" and did not realize what she said, and one witness stated that she asked why he had not been to see her when he had been there just the day before.

Plaintiff's mother testified that she was constantly in attendance on her daughter after she was injured and that the doctors gave her hypodermics two, three or

four times a day during the two months plaintiff was in bed; that plaintiff's eyes were glassy and half of the time were shut; that she appeared to be unconscious nearly all the time; that plaintiff appeared to be in her right mind ''for a minute'' and then ''she would doze off;'' that plaintiff would scream ''to the top of her voice'' when anyone would move her; that when defendant's claim agent came to the house she saw him with a paper (this refers to the release that was then signed) and in the presence of Smallwood, plaintiff's husband, that the agent tried to talk to plaintiff but that plaintiff did not answer him and that she held no conversation with him. ''Q. Did she appear to understand him or anyone else when he was in the room there? A. No, sir, she didn't.'' At the time she signed the paper plaintiff's eyes were nearly closed. ''Q. Did she appear to be conscious of the transaction being made between her and the claim agent? A. No, sir, she didn't know a thing or understand a thing. Q. Did she appear to know anything? A. No, she didn't. Q. Now you may state why you say she didn't appear to know anything about the transaction. A. Because she was lying there in a stupor.''

She further testified that the claim agent held a paper or papers and told plaintiff to sign it and ''she kind of scribbled over it.'' This was done by the left hand because the right was in splints. She further testified that plaintiff had had a hypodermic on that day. On cross-examination she testified that she was seventy years of age, that at the time the claim agent came with the paper to be signed it was three or four days after plaintiff was injured. The witness further testified that she didn't know what was in the paper, that she was too busy with her daughter; that she didn't pay any attention to what Smallwood and the claim agent were talking about; that ''I never pay any attention to what men say when they are talking in the house;'' that the claim agent was talking something about settling, ''I didn't know just exactly what.'' She further testified that plaintiff didn't utter

a word while the claim agent was there and that she was not asked to read the instrument. She testified that she could not read very well and could not write with a pen; that she didn't read the paper being signed or say anything to the claim agent because "it was none of my business;" when asked what she said to plaintiff's husband, she said "I didn't say anything; I do not bother men while they are talking; I told you it was none of my business; I have been better raised than to go in and talk to men when they are talking business that way;" that she did not know whether they were talking business; that she did not interfere with men when they were talking. We gather from her testimony that she thought they were talking over some business relative to a settlement and that she never interfered with men when they were talking over business, and that she did not think the subject of the conversation was any of her business; that she did not know what was in the paper, did not hear it read or explained. The evidence shows that while the so-called release purports to be signed by her as a witness, she denied that she signed it. Plaintiff testified that she had no recollection whatever of signing any paper on the day in question or at any time; that she remembered nothing until ten weeks after the collision.

We think there is no question under this testimony that there was evidence from which the jury could say that plaintiff was of such condition of mind as to not understand the nature and quality of her act or to realize the antagonistic position of her adversary or to cope with him in making a bargain. [Logan v. Uniter Rys. Co., 166 Mo. App. 490; Hubbard v. Lusk, 181 S. W. 1028; Porter v. United Rys. Co., 165 Mo. App. 619; Edwards v. Mfg. Co., 221 S. W. 744.]

But defendant claims that the fact that plaintiff was right-handed and signed the release with her left hand, brings into play the "physical fact" rule. (Such physical facts as the courts will take judicial notice of although the jury may have found contrary thereto.) That the

court will judicially know that her signing with her left hand not only required a merely manual effort but an act requiring the exercise of intelligence and the use of the mind. Her signature has been submitted to us for inspection and shows that it was the result of a somewhat labored effort but it is legible and does not appear to be any different from that we would expect to find in any ordinary signature made with the left hand by a right-handed person. However, we cannot say as a matter of law that this signature was made by a person in a con- dition of mind sufficient to make a valid release. We do not think that there is any "physical fact" involved, but rather a matter of mental condition. For a right-hand- ed person to write with his left hand might require some physical effort and some mental concentration but it would not necessarily require the full possession of the mental faculties. Plaintiff denied the endorsement of her name on the draft given in consideration of the release. This draft was endorsed in her name either on the day the release was signed or the day following, as the draft was deposited on the following day after the release was signed. But there may be an inference from the evidence that the draft was endorsed by her as the signature on the draft is somewhat similar to the one on the release. It is insisted that plaintiff also signed the deposit slip about that time. The evidence is to the contrary. The fact that she may have signed her name twice in two days under the circumstances would not affect the matter in our opinion.

It is insisted that the demurrer should have been sus- tained because plaintiff ratified or adopted the settle- ment for the reason it is claimed that she used a portion of the money. The facts in this respect show that the draft and some other money belonging to Smallwood, plaintiff's husband, were taken by him and deposited in a bank in opening up a joint account in the name of the two. The amount of the settlement was $1300. The evi- dence shows that the first check that plaintiff drew was

on November 2, 1920, and that by that time her husband had drawn out of the account for his own use $1696.96, or nearly $400 more than the amount of the settlement. It is claimed that plaintiff admitted that she drew out for her own use between $30 and $50 of this money. She testified in her deposition, which was introduced in evidence, that she did not find out about the settlement until ten weeks after her injury, when her husband told her about it. "All the money that I spent out of that was between $30 and $50. I gave small checks of it myself because the money is always in both of our names. I do not know whether I spent his money or mine, or what." It seems that at the time and after the account was opened, her husband's wages were deposited in it. This testimony of plaintiff is all there is in the record that would even suggest that plaintiff might have received some of the money from the settlement, and this testimoney is too indefinite as to hardly amount to substantial evidence that she did receive it, in view of the fact that she drew no check until November 2nd. She testified at the trial that she did not receive a cent of the money paid in the settlement and there was other testimony tending to show that she did not. We think there is no merit in this contention.

It is next insisted that the demurrer to the evidence should have been sustained for the reason that there was no tender back of the consideration paid by the defendant for the release. Of course, it has been held repeatedly that where fraud inheres in the lease or there is fraud in the *factum,* as distinguished from fraud inuring in the release or fraud in the treaty, the release is absolutely void, and a tender back of the consideration is not necessary. [Meeker v. Railroad, 255 S. W. 340; McCoy v. Construction Co., 216 S. W. 770, 772; Green v. Railway, 251 S. W. 931, 933; Edwards v. Mfg. Co., supra; Loveless v. Mining Co., 201 S. W. 375; Malkmust v. Cement Co., 150 Mo. App. 446.] As the fraud in the case at bar inheres in the procurement of the release, no ten-

der of the consideration was necessary. But defendant claims that there is no fraud shown; that conceding that plaintiff was not in a sufficient state of mind to make a release at the time she signed the paper purporting to be a release, there is no evidence that the claim agent knew this. It is not necessary for us to say whether this would make any difference in regard to the rule requiring a tender of the consideration of the release, for the reason that we think there is evidence from which the jury could say the claim agent realized the situation. This requires a more detailed statement of the facts concerning the procurement of the release.

The facts show that the claim agent came to plaintiff's house a day or two after the collision and inquired if Smallwood or his wife required any assistance, and addressed the husband by his first name although he had never seen him before; the claim agent told Smallwood to call the former up if he needed anything, that he was at his service; that a week or ten days later the agent called again and made similar statements; that at both of these times plaintiff was unconscious and the claim agent did not attempt to have any conversation with her. However, defendant in its reply brief admits that the claim agent saw plaintiff on both occasions. Thereafter plaintiff's husband talked to the claim agent over the phone once or twice, resulting in the claim agent's inviting him to come to his office. Smallwood went to the office and found that the claim agent wanted a statement of the accident. The claim agent wrote the statement and Smallwood signed it. This statement covers what occurred at the time of the collision, the resulting injuries to plaintiff and a statement as to the damage to Smallwood's automobile. The statement recites that the automobile which was practically destroyed cost Smallwood $1235 and was mortgaged for $618.41 and had been driven 1256 miles. On this occasion the claim agent told Smallwood that he had no authority in the matter but would procure authority from the main office at St. Louis.

On the day the so-called release was signed the claim agent called Smallwood up again and told him that he had the papers back from the general office. Smallwood called upon the agent who said to him when he arrived, "I suppose you came down to settle with me, didn't you, Frank?" (This was the first time a settlement was mentioned.) Smallwood replied in the affirmative "that is what I am down here after, I want to settle *my part of it.*" The agent asked "what do you call your part" and he answered, "myself and car and wages." The agent asked what this amounted to and Smallwood "figured it up on a piece of paper" and found that the loss of the automobile, loss of his wages and plaintiff's doctor's and nurses's bills amounted to about $2000. The price of such a car as Smallwood's had advanced $150 and they agreed that he should be allowed $80 on this account. The car cost $1233 but the claim agent said "we wont split the $5 and agreed on $1235 as the value of the car. Smallwood also told the agent of the mortgage on the car but it seemed that the agent knew of this as the holder of the mortgage had notified the defendant that he had a claim against the defendant for the amount of the mortgage. The claim agent refused to settle Smallwood's part of the loss unless plaintiff's cause of action was also settled.

The claim agent drew a draft for $618.41 in favor of the holder of the mortgage and had Smallwood sign a release for this amount, and another draft for $1461.59, payable to plaintiff and her husband jointly. This latter amount represents the $1300 which was the consideration expressed in the release and $161.59 to cover Smallwood's claim. A release was drawn by the claim agent wherein plaintiff purported to release all of her claims against the defendant, and Smallwood all of his claims against the defendant growing out of plaintiff's injury.

It will thus be seen that the $161.59 was all that was paid to Smallwood for his interest in the automobile, his loss of wages and for doctor's and nurse's bills for which he was liable, and personal injuries to himself in the

face of the fact that they had already agreed that the total amount of money paid ($2080) by, defendant to settle with the mortgagor and Smallwood and his wife, represented only slightly more than what had been agreed upon as Smallwood's loss, exclusive of his cause of action for his wife's services.

In response to a question by a juror the claim agent stated that he knew that Smallwood had some financial interest in the car above the amount of the mortgage. He testified that before the settlement Smallwood told him that the holder of the mortgage had been "crowding him for payments" and that he, the claim agent, had been putting him off and telling him that he would not make settlement until things were in such condition that he could make one final settlement with both Smallwood and plaintiff; that he would not advance him any money..

After the release was drawn by the claim agent it was signed in his office by Smallwood and thereupon the claim agent signed the following certificate—

"We severally certify that we witnessed the execution of the within release and that it was read over and fully explained to Cordia Smallwood and Frank Smallwood in our presence before such execution, in the English language, and fully assented to by them."

The release was then taken by the claim agent, who was accompanied by Smallwood, to plaintiff's house to be signed by her. It is admitted that the release had not been signed by plaintiff when the claim agent signed this certificate and, in fact, that the release was never read over to her. The claim agent testified that he explained the release to plaintiff but this is denied. While the claim at the office went into Smallwood's loss with great detail, no discussion was had concerning the monetary loss of plaintiff, and how her loss and the loss of her husband for her services came to be fixed at $1300 is not intelligently explained. Smallwood's damages were calculated and arrived at and the amount thereof finally turned out to be substantially the amount of the settlement of both

his and his wife's claims. There is an inference that in order to get what was coming to Smallwood, he was required to have his wife sign away her rights.

Much is made of the testimony that there was good feeling existing between plaintiff and her husband during all of this time and that the settlement was negotiated by Smallwood and that the so-called release was signed by plaintiff in his presence and in the presence of plaintiff's mother, and that the claim agent should not be convicted of fraud in view of this situation. Plaintiff offered to show that the reason why Smallwood made the settlement was that he was in debt on the automobile, that the holder of the mortgage was threatening to garnishee his wages and that such a garnishment would mean the loss of his position; that he did not know that his wife was injured as seriously as it turned out, and that his supposition as to the nature and extent of her injuries was based upon what the attending physician told him, and from that information he concluded that she was only temporarily injured and would soon recover. The court sustained an objection to this testimony. As the case was tried by the defendant upon the theory that the testimony as to why Smallwood permitted his wife to sign the release under the circumstances was immaterial, we shall so consider it. It may be that the proffered testimony was immaterial but so much of Smallwood's financial predicaments as was known to the claim agent was material in view of defendant's contention that the claim agent relied upon the fact that Smallwood was plaintiff's husband and for that reason ought to be excused in assuming that plaintiff was capable of signing the release.

Smallwood testified that he knew that plaintiff was settling her cause of action at the time she signed the purported release. The claim agent testified that at the time the purported release was signed he knew that plaintiff had been in bed for a month and had gone through a great deal of severe pain. The evidence shows that plaintiff's husband had no authority to represent

her and never at any time stated to the claim agent that he had. During the negotiation of the terms of the settlement between Smallwood and the claim agent, Smallwood asked to be excused, saying that he would be back later but not stating where he was going. He, in fact, went to the holder of the mortgage to find out the amount of it. There is some suggestion by the defendant that the claim agent thought he was going to consult his wife, but that was not what he told the claim agent and we are not drawing inferences in favor of defendant. When Smallwood and the claim agent went to plaintiff's house they went into the room where she was sick in bed and the claim agent said to plaintiff, "Well, Frank and I have come to a settlement and we want you to sign this paper." Plaintiff made no answer, and said nothing at any time. The release was not read over to her nor explained. The claim agent furnished the pen and plaintiff's husband turned her over so she could sign the so-called release, which was placed upon a pillow for her signature.

It is not necessary for us to attempt to defend the conduct of Smallwood in having his wife sign the purported release. However there is evidence tending to show, together with the offer of proof, that he attempted to settle his part of the claim without involving his wife, but on account of financial difficulties it was neces sary for him to raise funds in order to keep from losing his position; that the claim agent knew that Smallwood had to have money to make the payment on his car, which had been destroyed, and refused to settle with him alone but insisted that the release be drawn so that he and his wife should both settle all their claims against the defendant. It may be that the claim agent was justified in making the settlement in this way. We do not say, but this circumstance tends to show that the claim agent knew that plaintiff's husband was under some compulsion to make the settlement in the way that it was made, and that he was not justified in relying entirely upon the fact that Smallwood was the husband of plaintiff and was free

to properly protect her interest. The evidence shows that Smallwood's trade was that of a blacksmith and welder. He was working in that capacity for a railroad. The record discloses that he was a man of no great intelligence, all of which was apparent to the claim agent. Smallwood had told him that he wanted to settle his part of the claim and at no time told him that he had authority to represent his wife. The claim agent knew that plaintiff had been severely injured and had suffered a great mental shock by reason of her injury. He had been to the house on two occasions at which times plaintiff was unconscious. If plaintiff was in the condition that her mother testified she was in at the time she signed the release, and the jury could have found that she was in such a condition, the claim agent could hardly help from discovering that she was in no condition to sign it. While the mother may have witnessed the release, the evidence shows that she was an elderly woman and a person of little intelligence and thought it was none of her business what the character of the transaction was that was being carried on, and her testimony fails to show that she knew in fact the full extent of what was occurring. All this was apparent to the claim agent.

A point is made that the mother testified that the release was signed three or four days after the injury when it is admitted that it was signed a month thereafter. The mother would be more apt to remember what occurred on that day than the exact time the release was signed. This was all for the jury.

The claim agent seemed very eager to get the release signed by plaintiff. He signed the witnesses' certificate in advance and although it recited that it had been read over and fully explained to plaintiff, it was not then or ever read by her and was not explained to her. It was evidently the claim agent's intention when he drew the release to see that these things were done but in his eagerness he wholly failed to see to them. In fairness, even were plaintiff then a person of full mental

capabilities, these things should have been attended to. The claim agent, seeing that plaintiff was sick, if she was not unconscious, in which case he should not have presented the matter, at least should have explained the release to her as her husband did not do so. There was ample evidence from which the jury could say that plaintiff was overreached by the claim agent at the time the purported release was signed.

It is insisted that the court erred in permitting the witness Bell to state her conclusion as to plaintiff's mental capacity. There is no merit in this contention. The proper foundation was laid. The witness showed that she had been in constant attendance upon plaintiff from the time she was injured. She testified that plaintiff was in a stupor and described plaintiff's condition generally, and the effort of the claim agent to talk to plaintiff, etc. [Roach v. K. C. Rys. Co., 228 S. W. 520, 522; Fulton v. Railway, 125 Mo. App. 239, 241; Kirchoff v. Railway, 155 Mo. App. 70; Limbaugh v. Forum Lunch Co., 258 S. W. 451, 454; Kuehn v. Ritter, 233 S. W. 5, 7, 8.]

Complaint is made of plaintiff's instructions Nos. 1 and 2. Instruction No. 1 is as follows:

"If you believe and find from the evidence that at the time plaintiff signed the release in evidence plaintiff did not know the contents of the same, and that she was at said time mentally incapable of understanding the contents of said release, or the nature and effect of her act in signing the same; and if you further find that defendant's agent . . . knew these facts (if you so find them) and that with such knowledge (if you so find) he procured her signature to said release at said time, then you are instructed by the court that said release is null and void as to plaintiff and the same constitutes no bar whatever to this suit, although the amount paid plaintiff by defendant for said release, together with interest thereon as defined in another instruction, is to be considered in reduction of the amount of plaintiff's damages (if you find she is entitled to recover damages)."

Instruction No. 2 tells the jury if they found in favor of plaintiff on the issues submitted to them in instruction No. 1, and if they—

". . . further find that as defendant's engine approached said 25th Street at said time defendant's employees operating the same negligently (if you so find) failed to ring any bell or sound any whistle upon said engine at a distance of eighty rods, or at any lesser distance, from said crossing; and that defendant negligently (if you so find) failed to give any kind of warning whatever of the approach of said engine to said crossing; and if you further find that defendant's engineer in charge of said engine negligently (if you so find) caused said engine and train to be moved over and across said 25th Street, at grade, within the city limits of Kansas City, Missouri, at a greater rate of speed than six (6) miles per hour; and if you further find that plaintiff's said injuries were directly caused by negligence of the defendant's employees in the respects herein submitted (if you find defendant's employees were negligent in the respects herein submitted); etc.," their verdict should be for plaintiff.

The complaint made against instruction No. 2 is that it submits in the alternative the duty of the defendant to sound the whistle or ring the bell. It is contended that there was no obligation upon it to sound the whistle for the reason that the collision occurred in the city limits of Kansas City and under the statute the sounding of a bell was sufficient as a whistle is only required to be sounded in the country. Plaintiff admits there is no obligation to sound a whistle within the city limits of a city but insists that the instruction is not misleading. It seems to use that the instruction really places a greater burden upon plaintiff than the law required. While it is true the jury are required to find that defendant failed to ring a bell or sound a whistle, it also has the jury find in conjunction with those matters that defendant negligently "failed to give any kind of warning whatever

of the approach of said engine to said crossing.'' The jury therefore could not have misunderstood what was meant by the instruction. It clearly means that if no whistle or bell was sounded or any other kind of warning given, and the train was operated at a speed in excess of six miles per hour, and plaintiff's injury was caused by such negligence, they should find for plaintiff. No just complaint can be made of the instructions. [Moyer v. C. & A. Rd. Co., 198 S. W. 839, 844.]

It is insisted, however, that where the instruction mentions ''any kind of warning'' it refers presumably to negligence in failing to establish some sort of electrical signal device at the crossing. Nowhere in the record is there anything to suggest that any claim of such a failure was being made by plaintiff. Even if there were, this language could not be so narrowly construed for the reason that the instruction mentions ''any kind of warning *whatever*.'' It is insisted that the instruction only submits the negligence of defendant's employees as the proximate cause of the injury while failing to give any kind of warning is charged up to defendant generally without mentioning employees. There cannot be any merit in this contention for the reason that defendant being a corporation could only do or fail to do any specific thing through its employees. This last claim seems a mere splitting of hairs.

It is insisted that there is no evidence from which the jury could find that the operation of the train at a speed in excess of six miles an hour was the proximate cause of the injury. There was evidence that the engine was going as high as fifteen miles an hour, and the jury readily could have found under the testimony that the automobile would have cleared the track had the train been going at or under the ordinance speed. [Stotler v. Railway, 200 Mo. 107, 135, 136.]

Complaint is made of the refusal to give defendant's instructions E and F. These instructions were drawn upon the theory of adoption of the release signed by plain-

Smallwood v. St. L.-S. F. Ry. Co.

tiff by retaining the consideration paid therefor, and it was sought to instruct the jury that plaintiff adopted the settlement if she used or "permitted" her husband to use the money or any part thereof. Defendant put upon the stand a witness who testified that soon after the 13th of September, 1920, plaintiff told her that she had been hurt in a collision with defendant's train and that defendant had made a settlement with her and that it had bought her an automobile. Defendant in this connection insists that plaintiff signed her name on the signature card required by the bank when the joint deposit was made, but the evidence is to the contrary. Plaintiff testified that it had been the custom for her and her husband to have a joint account at a bank and that this arrange-. ment was "satisfactory in a way to her and then it was not," "I didn't approve of it myself." She positively testified that she had no recollection of this account being opened and there is no evidence that she had any knowledge of the fact that her husband was opening an account in the bank in this manner and was depositing the draft covering the amount of the settlement. There is testimony on the part of the agent who sold the car that he assumed that he was thanking both Smallwoods for buying the car when it was delivered. Plaintiff testified that the car was bought by her husband, "unbeknown to me and he does other things unbeknown to me that I don't know anything about." The testimony shows that the day Smallwood opened the account he withdrew $1,000 for the purpose of buying the new automobile.

Even though there was testimony that the day after the release was signed the new automobile was bought with plaintiff's consent, the instruction in reference to permitting her husband to use the money was extremely broad. The instruction states that if plaintiff "permitted" her husband to use any of the money she adopted the release, and the word "permitted" was not restricted in any manner whatever so that the jury could not only consider it in reference to the purchase of the automobile,

but were given a roving commission to consider any testimony which in their judgment might show a permission on her part given to her husband to use the money. Webster defines the verb "permit" as "To allow by tacit consent, or by not hindering; take no steps to prevent: consent tacitly to; suffer." A jury under this instruction could find that plaintiff adopted the release if she merely suffered her husband to use some of the money, that is, knowing that he was using it she made no objection, whether she thought such an objection would be effective or not. In addition to this the money paid in consideration of the release was paid jointly to plaintiff and her husband in consideration of the release by both of them of their causes of action against defendant. Smallwood has as much right to the money as did his wife. How could she refuse to "permit" him to use a portion of it? Of course, the instruction was entirely too broad, assuming that plaintiff by her conduct in using the consideration, if she did, could have adopted a contract that was absolutely void, a matter that it is not necessary for us to pass upon.

It is stated in Ruling Case Law under the subject of release—

"Where a release of damages for personal injuries is procured by fraud, the releasor does not ratify it by using the consideration money, if such use is made in ignorance of the fraud. In general there can be no affirmance or ratification of a release without full knowledge of its terms. *Nor can there be a release of a cause of action without unequivocal acts of the plaintiff showing* expressly *or by necessary implication that he intended to release.* And there can be no ratification or affirmance unless the plaintiff knew, or ought to have known, all the facts and circumstances attending the act to be ratified. Ratification presumes the existence of knowledge of all the facts, and one not informed of the whole transaction is not in a position to ratify the same. Nor is the receipt of the money an affirmance of a release unless

paid in satisfaction of the plaintiff's cause of action, or received after he knew, or ought to have known, that he had a cause of action and that the money was paid in satisfaction of it.'' (Italics ours.) [23 R. C. L., p. 390.]

It ought not to be said that plaintiff adopted a release that was procured by fraud unless some unequivocal act is shown on her part giving rise to an inference that she intended her conduct to amount to a ratification, or that reasonable minds would say that she was guilty of some act tending to show that she must have intended an adoption of the contract. [Rau v. Robertson, 260 S. W. 751.] The jury, of course, would not have been properly instructed with reference to the law of adoption by these instructions as they only left for its consideration whether plaintiff merely suffered her husband under the circumstances of this case to use some of the money paid in consideration of the release.

It is claimed that plaintiff's instructions Nos. 1 and 2 conflict with defendant's instruction B. Defendant's instruction reads as follows:

''You are instructed that if you find and believe from the evidence that on the 21st day of July, 1920, defendant gave to plaintiff and Frank Smallwood the draft offered in evidence for the sum of $1461.59 and that plaintiff signed her name on the back of said draft, if you so find, knowing the nature of said instrument, if you so find, and that said draft was paid by defendant, then you are instructed that regardless of any other fact or circumstance in evidence, your verdict shall be for the defendant.''

It will be noted that plaintiff's instruction No. 1 predicates a finding that the *release* was void upon a mere showing that the claim agent knew plaintiff's mental condition at the time he procured her signature to it, while defendant's instruction B tells the jury, in effect, that notwithstanding the *release* may have been fraudulently procured, if plaintiff signed her name to the *draft* covering the consideration for the release and the draft

was paid, the verdict regardless of any other circumstances must be for defendant. Instruction B was submitted on the theory of adoption, a purely defensive matter. We think under the issues made in the pleadings that plaintiff's instruction was proper. It will be noted that the answer does not mention an endorsement and paying of the draft, but bases the defense upon the execution by plaintiff of the *release* which was attached to the answer and marked Exhibit A. The signing by plaintiff of the draft (and there may be an inference in the evidence that she did sign it) may have had some bearing upon the issue pleaded in the answer, that is, the execution of the release, which the reply alleges was procured through fraud, but the signing of the draft was merely a chain in the evidence tending to show that plaintiff was of sound mind at the time she signed the release. Plaintiff's instruction was a proper one under the issues raised in the pleadings and no error can be assigned by reason of the giving of the same, even though defendant's instruction may be in conflict with it. [Teter v. C. C. & C. Co., 201 Mo. App. 538.] In Hoagland v. K. C. Rys. Co., 569, 572, it is said—

"The matter omitted, of which complaint is made, was not an element of plaintiffs' case, but was a matter of defense, brought into the case by defendant. Where plaintiff's instruction omits some feature which is not an element of his cause of action, but is merely a defensive feature, the omission may be cured by the instructions for defendant submitting that feature. [Owens v. Kansas City, etc., R. Co., 95 Mo. 169, 8 S. W. 350, 6 Am. St. Rep. 39; Wingfield v. Wabash R. Co., 257 Mo. 347, 361, 363, 166 S. W. 1037; Lange v. Missouri Pacific R. Co., 208 Mo. 458, 477, 106 S. W. 660; Barnard v. Waverly Brick & Coal Co., 189 Mo. App. 419, 423, 176 S. W. 1108.] But where the omission is a necessary element or a principal feature of plaintiff's case, then the inclusion thereof in defendant's instructions cannot cure it. [Hall v. Manfg. Coal & Coke Co., 260 Mo. 351, 368, 369, 168 S.

W. 927, Ann. Cas. 1916C, 375; Dameron v. Hamilton, 264 Mo. 103, 116, 174 S. W. 425; Cooney v. Pryor, 203 S. W. 630.]''

It is true that plaintiff's instruction tells the jury that any amount that was paid plaintiff was merely to be considered by them in reduction of the amount of plaintiff's recovery instead of such payment, if it was made under the circumstances mentioned in defendant's instruction, being an absolute bar to any recovery by plaintiff. (It might be well to say here that the jury expressly stated in its verdict that it had deducted $1500 from the total amount of plaintiff's damages, leaving her damages at $7500, for which it returned a verdict.) Therefore, at once, the point suggests itself as to whether there is not a conflict in the two instructions. But we are not required to answer this question for the reason that, as before stated, plaintiff's instruction was a correct one. If plaintiff was mentally incompetent the day she signed the release, she was incompetent when she signed the draft, if she did sign it. There is no evidence showing under what circumstances plaintiff's name was signed to the draft. When the name was signed is not shown except it is shown that the draft was deposited the day following the signing of the release. While defendant introduced testimony tending to show that plaintiff had a contracting mind at the time the release was signed, there is no evidence that plaintiff's mental condition was any different on the day following the signing of the release than it was on that day. It was, then, really a question of what was plaintiff's condition of mind on the day following. There was no room to submit to the jury a state of mind when the draft was signed different than when the release was signed. Plaintiff's instruction told the jury if plaintiff was not mentally capable when the release was signed, then the amount paid was merely to be deducted from plaintiff's whole damage. This was a proper instruction, at least under the circumstances shown in evidence.

The judgment is affirmed. All concur.