H. K. HANNAH, RESPONDENT, v. E. AARON BUTTS, APPELLANT.*

Kansas City Court of Appeals. February 11, 1929.

*Corpus Juris-Cyc. References: Agency, 2CJ, section 90, p. 474, n. 99; Appeal and Error, 4CJ, section 2708, n. 764, n. 80; Contracts, 13CJ, section 249, p. 370, n. 25; Evidence, 22CJ, section 502, p. 417, n. 65; Highways, 29CJ, section 429, p. 665, n. 66; section 434, p. 668, n. 13; Husband and Wife, 30CJ, section 167, p. 617, n. 66; Liability Insurance. 36CJ, section 129, p. 1130, n. 86; Release, 34Cyc, p. 1066, n. 71; p. 1071, n. 96; p. 1098, n. 75; p. 1105, n. 25; Trial, 38Cyc, p. 1632, n. 10.

*Burrus & Burrus* and *Mosman, Rogers & Buzard* for respondent.

*Lyons & Ristine* for appellant.

BLAND. J.—This is a suit for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $7500, and the defendant has appealed.

The facts show that plaintiff, a farmer living about three miles west of Odessa, was injured about 3:20 P. M. of Thursday, December 2, 1926, while he was riding in a farm wagon westwardly on United States Highway No. 50 and about two miles west of that city. He was driving his wagon along the paved portion of the highway, the pavement being eighteen feet in width.

Plaintiff testified that he saw two automobiles coming from the west and an automobile approaching from the east. At this time he was driving on the right-hand side of the pavement with two mules hitched to the wagon, with a third mule tied to the team and abreast and to the right thereof. ·On seeing these automobiles approaching he turned his mules and wagon so that the right wheels of the wagon were off of the pavement. Defendant in his automobile approached plaintiff from the rear at a rate of speed of from forty to fifty miles per hour. The automobile struck plaintiff's wagon. throwing him to the pavement and resulting in plaintiff receiving severe injuries.

The evidence shows that defendant was a resident of the State of Oklahoma but was residing temporarily in Kansas City. He was an oil operator and was engaged in "taking up leases" around Odessa. He would go to Odessa in the morning and return to Kansas City at night in his automobile. Defendant testified that he was blinded by the lights of the two cars approaching from the opposite direction

and did not see plaintiff until almost the instant of the collision, when he applied his brakes. This was immediately before the collision. We judge from the evidence that there could have been scarcely any slackening of the speed of his car before it hit the wagon. Plaintiff was immediately taken to his home and three doctors were called. He had a scalp wound on top of his head one and one-half or two inches long. Three or four stitches were taken in order to sew up this wound. He had an injured back, neck and right hand. X-ray pictures were subsequently taken which showed a breaking off of the lateral process of the 5th and 6th cervical vertebrae. The pictures also indicated that a ring of bone surrounding the spinal cord was broken. He had what is termed a spinal cord lesion. One of the physicians testified that the X-ray indicated plaintiff had "what is known as a fracture of the spine or a broken neck." He had a paralysis of the right leg and arm. He had a sensory paralysis of the left side and motor paralysis of the right side.

The answer, among other things, pleaded a release of plaintiff's cause of action. It was alleged that a release was executed on December 4, 1926, wherein, in consideration of the sum of $165 paid to plaintiff, he released defendant from all claims and damages on account of the injuries sustained by him. The reply was a general denial and, in addition, it alleged that the release was signed when plaintiff was totally paralyzed and unconscious; that it was negotiated by one Morgan, a claim agent or adjuster for an indemnity insurance company, who came to plaintiff's home and tendered to his wife the sum of $165 as a part payment on what was owing by defendant to plaintiff on account of plaintiff's injuries; that said Morgan falsely and fraudulently represented to plaintiff's wife that she was signing a receipt for said sum; that Morgan represented that his company would pay plaintiff an additional sum that would reasonably compensate plaintiff for his injuries and that said payment did not constitute a full settlement of plaintiff's claim against the defendant; that at that time Morgan was acting as the agent of defendant and the insurance company. Plaintiff further alleged his wife had no authority to execute the settlement and release of his claim against the defendant; that shortly after the pretended release was executed and as soon as plaintiff had recovered consciousness and had been advised about the payment of said money and that the defendant and the insurance company were contending that plaintiff's claim had been settled and released, plaintiff, through his attorney, tendered to said Morgan, agent for the defendant and the insurance company, said money and that said Morgan refused to accept it; that plaintiff has ever since and now offers to return said money.

Defendant insists that his instruction in the nature of a demurrer to the evidence offered at the close of all of the testimony should

1102

have been given, for the reasons, among others, that the evidence fails to sustain the plea of fraud set up in plaintiff's reply, and that there was no legal tender back of the money received by plaintiff in the settlement.

We think there was ample testimony tending to show that plaintiff was not mentally capable of negotiating the release at the time the same purports to have been executed. The evidence shows that plaintiff received a very severe injury and that thereafter and even before he was taken home he appeared to be in a dazed condition and in great pain. When he arrived home he appeared to be a man who had suffered a severe physical and nervous shock, "he was just limp." "He was limp, dazed and barely conscious." He was carried into the house and put to bed. About two hours thereafter Dr. Martin arrived and found that plaintiff had the appearance of a man who had been "in a rather severe accident, somewhat shocked and pretty well incapacitated." "I would say he was semi-conscious." Dr. Schooley examined him that night and found that "he had loss of motion of the right leg and he had a paralysis of the right arm." To relieve his pain the doctor gave him an injection of a quarter of grain of morphine and a hundredth of a grain of hyoscine. The doctor next saw the plaintiff the following, or Friday, morning. At that time he gave plaintiff a hypodermic of hyoscine and morphine. He saw him on Friday evening and about three o'clock Saturday morning, at each time he gave him a hypodermic of morphine and hyoscine. He saw him again about eight or nine o'clock Saturday morning and gave him a hypodermic of morphine and hyoscine. The injections were of the same quantity each time they were given. The doctor testified that "I kept him under those (drugs) the first three days;" that these injections tended to deaden pain and "stupefy the brain," "had a hypnotic effect," "tended to induce sleep" and "blunt the intellect." As a result of these injections plaintiff was partially unconscious on Saturday, December 4th. He stated that in his opinion plaintiff was not at the time last mentioned of sufficient mental capacity to transact any kind of business. The evidence shows that it was only a short time after the doctor gave plaintiff the injection of hyoscine and morphine on Saturday noon that the pretended release was executed.

Dr. Robinson, a witness for plaintiff, testified that he was a specialist on nervous and mental diseases; that he was called to see plaintiff on the evening of December 4th, about 7:30 or 8 o'clock; that at this time plaintiff was unable to move his right arm and left leg; that plaintiff could move his left arm and right leg to some degree; that plaintiff was "in a sort of semi-stuperous condition." "I did a spinal puncture on him and the fluid was just a trifle dis-

colored—a little bloody." This indicated there had been some bleeding into "the subcutaneous space beneath the membrane surrounding the brain and spinal cord." Plaintiff responded to questions slowly and seemed to be suffering from shock. Plaintiff appeared to have suffered at the time he received the injury a concussion of the brain. It was the opinion of the doctor that plaintiff was not of sufficient mental capacity to transact any business when the witness saw him.

Plaintiff's wife testified that she had waited upon him from the time he was brought home until a trained nurse was called on the evening of December 4th. The witness testified that plaintiff was brought home and put to bed; that he was unable to move any part of his body; that he got no rest the first night; that on Friday plaintiff was still "in that paralyzed condition;" that his right hand was swollen; that she had to move his head as he could not move any part of his body except his left hand; that he did not rest any Friday night; that about two o'clock Saturday morning she called Dr. Schooley, who came and gave plaintiff a hypodermic; that on Saturday morning "he was still lying there like he had been;" that the doctors came about eleven o'clock that day and made an examination of plaintiff, and Dr. Schooley gave him a hypodermic just before the doctors left at noon; that there was no change in the appearance of plaintiff. She testified that except for the time plaintiff was taken to Kansas City for the purpose of having X-rays taken, which was on December 27th, plaintiff was at home in bed nine weeks and three days after his injury; that after that time he attempted to sit up, but was only able to do so for a few minutes at a time, but he gradually grew some better.

Dr. Martin testified that the effect of a hypodermic of morphine and hyoscine would become almost immediate and reach its maximum perhaps in half an hour or forty-five minutes, but that the effect would continue from five to eight hours; that a combination of the two drugs would likely make the patient sleepy and listless and would effect his mental capacity; his mental reactions would be slower.

The evidence shows that defendant assisted plaintiff to his home on the evening of the injury. Defendant testified that he immediately gave notice of the accident to the Western Automobile Indemnity Insurance Company at Bartlesville, Oklahoma, which company carried liability insurance on his car; that in consequence of this notice he got in touch with Mr. Morgan and the two of them went to plaintiff's house on Saturday morning, December 4th. The evidence shows that they arrived about ten o'clock and about an hour before the doctors came.

1104

Plaintiff's wife testified that defendant did not introduce Morgan as a representative of an insurance company until after the doctors left; that the doctors left about dinner time, but defendant and Morgan stayed for dinner; that after dinner defendant told her that Morgan was a representative of the Western Automobile Indemnity Insurance Company in which defendant was carrying insurance. Morgan then took up the matter of settlement with plaintiff and the witness, stating that he did not think plaintiff was hurt to any great degree. At any rate he talked the matter over with plaintiff and they agreed upon a settlement for the harness, wagon and what the nurse and doctors' bills would come to for two weeks, it being the opinion of Morgan that plaintiff would be out of the house in that time. The witness stated she thought plaintiff's condition was serious but Morgan kept insisting on making a settlement. She told him that she did not know the outcome of plaintiff's condition and did not know what the expense would be. So Morgan agreed that the settlement should cover only the expenses that could be determined at the time and that he would come back later and make further settlement. The evidence shows that she signed the release which was introduced in evidence and which purports to be a release in full of all damages sustained by plaintiff. She signed to the paper the name of the plaintiff and thereunder her name, under the impression that the paper was merely a receipt for such damages and expenses as could be determined at that time. She testified that her husband did not authorize her to sign his name to the release; that plaintiff agreed to the amounts of the various items contained as to the amounts, but did not agree to accept the same in settlement thereof; that Morgan did all the talking and the figures agreed upon were those suggested by him; that Morgan, after the release was signed, gave her a draft on the Western Automobile Indemnity Insurance Company in the sum of $165, which the witness afterwards indorsed. Plaintiff's daughter deposited the draft in plaintiff's bank account and it was withdrawn by plaintiff and used for household expenses.

Plaintiff's son testified that he was in the room where the alleged settlement was negotiated. He testified that Morgan asked his mother to sign a receipt; that Morgan did not ask the plaintiff to sign it and it was not read by any one before it was signed; that his mother signed it immediately after Morgan presented it to her. He testified that his father agreed upon the various items of damages that were mentioned, but that he did not enter into the conversation, and made no remarks except "yes" and "no;" that his father "seemed to be in a stupor," "sort of a dazed semi-conscious condition," from Friday evening until Sunday morning.

Plaintiff's daughter testified that during the time that defendant and Morgan were there on Saturday, December 4th, plaintiff's con-

dition had not changed, so far as she could see, from what it was on the day before, "he was still very weak, unable to handle himself. We had to feed him. He was not able to do anything for himself." "Well, he wasn't paying much attention to any of us, just simply lying there in bed." "Well, physically he was almost helpless, unable to help himself, drowsy most of the time it seemed to me."

Defendant testified that he and Morgan talked over with plaintiff, his wife and the son the matter of settlement; that as soon as Morgan and he arrived on Saturday morning he introduced Morgan to plaintiff and Morgan told plaintiff that he was an adjuster for the insurance company in which defendant held a policy. Morgan said, "I am here to represent him (defendant). He has got a policy with us and so if we can arrive at a settlement I am ready to pay you something." He further testified that after dinner the matter was talked over and they all agreed upon the amount; that Morgan read the release over and handed it to plaintiff together with a check for $165. Plaintiff was sitting up in bed. Plaintiff handed the pen to Mrs. Hannah, told her to sign the release and thereupon Mrs. Hannah signed it. Plaintiff did not sign the release as his hand was bandaged.

Morgan testified to substantially the same state of facts as those given by defendant with reference to the execution of the so-called release. They both denied that anything was said about its being a partial release or receipt. The testimony of defendant and Morgan tended to show that plaintiff was in possession of his mental faculties and fully capable mentally of executing a release when it was signed. Morgan testified that the negotiations for the settlement were had with plaintiff and the latter's wife and began twenty or thirty minutes after dinner and covered a period of thirty minutes when the release was signed by Mrs. Hannah.

Plaintiff testified that for two weeks following his injury and beginning with the time he arrived home that night and was given a hypodermic injection by the doctor, he did not recollect anything that happened.

In discussing the point under consideration defendant argues that the only injury that plaintiff had that would impair his ability to transact business was the alleged concussion of the brain. As we understand it defendant desires us to take judicial notice of the alleged fact that if plaintiff had suffered a concussion of the brain his mental impairment would have commenced contemporaneously with the receipt of the injury. In this connection defendant points to the fact that plaintiff was able to detail the happenings from the time he was injured up until the time he was given the hypodermic injection referred to. The doctor testified that plaintiff was suffering

from concussion of the brain, and we cannot say, as a matter of law, that he did not suffer such a concussion.

However, it was unnecessary for the jury to find that plaintiff did suffer a concussion of the brain in order to find that plaintiff was in no mental condition to enter into a release of his cause of action. The evidence shows that plaintiff sustained a very severe nervous shock and injury to his spine and spinal cord; that he was under the effect of stupefying drugs over practically the entire period between the time the doctors first saw him until long after the so-called release was executed. There is ample testimony tending to show that plaintiff was not of sufficient mental capacity to execute or direct the execution of a valid release at the time the so-called release was signed by his wife. In discussing this point defendant presents a number of other matters which we think were for the consideration of the jury, such as the fact that the testimony shows that Morgan was invited to return and visit the Hannahs, whereas, in view of the fact that it was understood that he was coming back to make further settlement, no such invitation was necessary, and that there was testimony on behalf of plaintiff by various witnesses and relatives of plaintiff concerning statements and conversations had with him during the time he claims that his memory was a blank. However, these matters were all for the consideration of the jury. In considering a demurrer to the evidence this court must view the testimony, and all reasonable inferences that may be drawn therefrom, in the most favorable light to the plaintiff, and if there is any contradiction in the testimony, even of the plaintiff's witnesses, then, we are under the duty to consider only that which is most favorable to plaintiff. [Frenkel v. Hudson, 271 Mo. 495.] An appellate court is in no sense concerned with the weight of the testimony. It is true that the record discloses a rather unusual situation, in that on cross-examination plaintiff testified without explanation made, then or afterwards, that about three weeks after the date of the receipt of his injury he made a statement to members of his family that he "thought" "he had settled too soon and should have waited longer." However, this admission to his family occurred before the trial and not having occurred during the trial, plaintiff was not conclusively bound thereby. [Davidson v. St. L. & S. F. Ry. Co. 301 Mo. 79, 86.]

However, it is insisted that plaintiff is estopped from claiming that the release was void on the ground that it was procured through fraud, for the reason that he did not tender back the amount he received at the time the release was signed, and that assuming that his wife was not authorized to make the release for him he afterwards ratified her act by retaining the benefits received, that is, the $165 paid. In this connection plaintiff testified that he had no recollection of Morgan and defendant having been to his home on December 4,

1926, nor did he recollect having made any settlement with them; that it was about three weeks after he was injured before he learned a draft for the money had been left at his home and at that time he was told that the money had been paid on a partial settlement, only, for his injuries. The evidence shows that he was taken to Kansas City on December 27th, for the purpose of having X-ray pictures taken. This must have been two or three days after he learned the money had been paid. He stated that about a week after he found out about the payment of the money he had his wife or daughter write his attorney, who lived at Independence, and ask him to come to see him. Plaintiff was brought back from Kansas City on the 28th. His attorney came to see him about the first of January, 1927, and at this time plaintiff instructed his attorney to return the $165.

Plaintiff's attorney testified that in compliance with the instructions he received from plaintiff he attempted to find defendant for the purpose of making tender to him personally, but was unable to locate him; that after seeing plaintiff he attempted to get into communication with Morgan; that he finally saw Morgan by appointment at the Court House on January 17, 1927, and there tendered him the sum of $175. He testified that he did not know exactly how much had been paid on the release, but that he tendered this amount to Morgan as the money paid under it. This was prior to the bringing of this suit. The testimony shows that Morgan refused to accept the money. Plaintiff sought to show by his attorney that defendant was a non-resident of this State and that he could not be found so that the money could have been tendered to him, but the court refused this offer upon objection being made by defendant. As to what occurred at the Court House, Morgan testified, "he (plaintiff's attorney) asked me if—he said 'I am going to tender you $165 for that release,' "I said to him, 'Mr. Burrus, Rufus,' I said, 'I would be a fool to take that $165 from you.' "

Defendant insists that there is no showing that Morgan was a duly authorized agent of the defendant for the purpose of receiving this tender. The evidence of the tender was objected to by defendant at the trial. However, as far as the question of fraud is concerned it was unnecessary for plaintiff to make any tender whatever in this case, if the jury believed there was fraud inhering in the release. [Smallwood v. St. L. & S. F. Ry. Co., 263 S. W. 550.]

It is contended that the demurrer to the evidence should have been sustained for the reason that plaintiff was guilty of contributory negligence as a matter of law, in not having any light on his wagon while driving along the highway later than thirty minutes after sundown. Defendant seems to rely, in part at least, upon the statute of this State, Laws 1921 (extra session), page 95, in reference to lights upon motor vehicles, but that statute has no reference to farm wagons being driven on highways. It is argued, however, that

it is contrary to statutory law for a motor vehicle to travel upon highways more than thirty minutes after sundown without a visible red light on the rear of said vehicle, and that there is a greater necessity for a slower moving vehicles, such as a wagon, to be equipped with such a light than a fast moving vehicle, such as a motor vehicle. We are not prepared to say, as a matter of law, that plaintiff was guilty of contributory negligence under the circumstances shown in this case, because he did not have a light upon his wagon. We think undoubtedly this was a matter for the consideration of the jury. It was said in Roper v. Greenspon, 192 S. W. 149, 155: "Gen erally speaking at common law, the driver of a wagon upon a high way at night is under no duty to carry a light to warn others of the presence of his vehicle or its load." [See, also, Barry on Automobiles (4 Ed.), page 174; 1 Blachfield, Encyclopedia of Automobile Law, page 384; Bombard v. Newton (Vt.), 111 Atl. 510; Idell v. Dey (Pa.), 116 Atl. 506.]

However, even though plaintiff were negligent his negligence must have been a proximate cause of his injury in order to defeat his recovery. In other words the uncontradicted testimony should make it appear that the injury would not have occurred had he carried a light on the wagon. [Roper v. Greenspon, supra; Meredith v. Claycomb, 216 S. W. 794; Napier v. Patterson (Ia.), 196 N. W. 73.]

We think it is apparent that under the facts as established by plaintiff's evidence this court cannot say, as a matter of law, that either plaintiff was negligent, or that if he were, such negligence contributed to his injury. The evidence shows that he was driving on the right-hand side of the road with his two right wheels off of the pavement when the automobile going forty or fifty miles per hour struck him. It was not dark at the time he was struck. Some of the witnesses referred to the condition as twilight. The road was straight at the place of the collision and one could see for several hundred feet during the daytime. Plaintiff testified that he quit work about sundown; that it was twilight; that he could see houses around the neighborhood a quarter of a mile off; that he could see east a quarter of a mile and could see west "the same distance or better." The motor-policeman who came up shortly after plaintiff was struck, and before plaintiff was removed, stated that at the time he came up he could see one of the mules "a little less than half a quarter;" "it was in the twilight, it wasn't dark enough but what you could tell what an object was some little distance ahead of you." "It was light enough so I could see beyond the reflection of the light, it wasn't dark enough for the light to throw an entire light." Plaintiff's daughter testified that it was not dark when he was brought into the house. Of course, under all this testimony, no court could hold plaintiff guilty of contributory negligence, as a mat-

ter of law, because he had no light on the wagon, which was a comparatively large object. The evidence shows the wagon had upon it sideboards.

It is the contention that the court erred in giving plaintiff's instruction No. 5 which reads as follows:

"The court instructs the jury that if you find and believe from the evidence that the plaintiff did not execute or authorize the execution of the release relied upon by defendant, then you are instructed that said release constitutes no defense in law to this action."

The reply in this case, in addition to an allegation of fraud, also alleges, in effect, that the release was made by a pretended agent of plaintiff, to-wit, his wife; that she had no authority to execute said settlement and release and that plaintiff had repudiated the settlement. We might say here that while we think the reply is sufficient to allege fraud on the part of Morgan, yet, that part of the reply alleging that he falsely represented to plaintiff's wife that she was merely signing a receipt for a partial settlement of plaintiff's cause of action, is not sufficient to plead a matter of fraud in this connection. There is no allegation showing that plaintiff's wife exercised any prudence in reference to the matter. One is not excused in signing a contract which the other party to the contract represents to be something other than it turns out to be, if the former fails to read the contract or to exercise some other act of prudence in reference to the matter. [See Hall v. K. C. So. Ry. Co., 209 S. W 582; Johnson v. Insurance Co., 93 Mo. App. 580, 591; Dyrssen v. Union Elec. Light & Power Co., 295 S. W. 116.]

The matter of authority of Morgan to receive the tender in question becomes important in connection with the consideration of plaintiff's instruction No. 5 and relative to the question of whether, regardless of any matter of fraud, plaintiff ratified the unlawful act of his wife in negotiating the release, a matter which the record fairly shows was a contested question at the trial and one of the theories upon which the trial was had in the lower court.

While the court instructed the jury upon the question of fraud and rescission in a number of instructions, there was no proper instruction given the jury upon the issue of ratification by plaintiff of the action of his wife in assuming to act as his agent in signing and executing the release in question. Under plaintiff's instruction No. 5, even though the jury believed there was no fraud, they could find for the plaintiff if he did not authorize the execution of the release. We think, therefore, instruction No. 5 is clearly erroneous for the reason assigned by the defendant, that is, that it tells the jury that the release constitutes no defense to this action, if they found merely that plaintiff did not execute or authorize the execution of the release, wholly ignoring the defense of ratification. Plaintiff

claims that the error, if any, in this instruction was cured by the giving of plaintiff's instruction No. 3. It would be difficult to draw an instruction curing a very positive instruction of this kind, but instruction No. 3 is on the question of fraud. This is conclusively shown by the manner in which it concludes, which is as follows: "It was not necessary for plaintiff to tender to any one a return of any money paid at the time." It is claimed by the plaintiff that there is no question of ratification in the case because (1st) the evidence is undisputed that there was no ratification; (2nd) ratification is not pleaded. We find no merit in either one of these contentions. It seems to be plaintiff's contention that because the tender was made as soon as it was, as a matter of law, it was made in time, and as there is no dispute that proper tender was made upon Morgan (which means, of course, if he had authority to receive it), there was no evidence of ratification. The rule in reference to ratification is that it must be made within a reasonable time, and what is such time is a question for the jury. [2 C. J., pp. 505, 509, 510.] It is claimed by defendant that Morgan was not such an agent of the defendant and the insurance company as had power to accept or refuse the tender. The authority of Morgan to receive the tender is established if it be shown that he was either the agent of the insurance company or of the defendant directly, for the purpose of receiving the tender. The evidence as to Morgan's authority is as follows: It is undisputed that Morgan represented the defendant and the insurance company at the time the alleged settlement was made. Defendant testified that pursuant to the notification he gave to the company at Bartlesville, Oklahoma, "he got in touch with Morgan." The record fairly discloses that the whole matter of handling the claim against the defendant was turned over by him to the insurance company and Morgan. Defendant, on cross-examination, testified that he turned the matter of settlement over to Morgan; that he merely listened to the negotiations with plaintiff; that the release was not delivered to the witness although made out to him; that he did not pay the money on it and in fact, paid nothing; that the settlement did not cost him anything; that it wasn't any of his business as to whether the insurance company paid plaintiff five or ten thousand dollars; that the only interest he had in the matter was in behalf of plaintiff. There was evidence that Morgan said during the negotiations for the settlement that defendant "wants to do the right thing and we are going to reimburse you."

Defendant testified that he saw plaintiff often after the first of January, 1927, visited with him and talked with him; that plaintiff said nothing to him "about being dissatisfied with the compromise" until the latter part of May or the first part of June, 1927, at which time plaintiff told him "he was dissatisfied with the settlement, that

he had made settlement too soon." Defendant expressed his surprise and told plaintiff "if you want me to, Mr. Hannah, I will take it up with the insurance company, and I will also speak to Mr. Morgan." Thereafter, defendant got in touch with Morgan and the two went to plaintiff's home. At that time the service of summons had not been secured upon the defendant. The evidence shows that a suit had been brought on behalf of plaintiff and against the defendant as one "Budd." This suit was afterwards dismissed and the present suit against the defendant in his right name was brought on May 6, 1927. Defendant testified that when Morgan and defendant arrived at plaintiff's home, at the time in May or June, defendant stated to plaintiff "I have got Mr. Morgan to come back with me and hope that you folks can reach a proper undertaking, you having been dissatisfied with your settlement." Morgan refused to do anything about the matter. There is no evidence that any tender before suit was made by or on behalf of plaintiff, except that made by his attorney.

Plaintiff testified that Morgan visited him in January, 1927. Morgan testified that he called at the plaintiff's home in the springtime at which time plaintiff remarked that "he had settled his case with me too soon;" that later on in May or June, 1927, defendant called him over the telephone and asked him to go with him to see the plaintiff. When they arrived at plaintiff's home the latter expressed dissatisfaction with the settlement and said he thought he had settled "too quick" and wanted to know "how much more I was going to give him." Morgan replied, "I told Mr. Hannah at that time we had settled his case and he had accepted his $165, signed a release, and that so far as I was concerned the case was closed." He further testified it was not part of his duties, as adjuster for the insurance company, to receive any money for the company from any source whatever. However, he testified that at the time of the trial he had been for fourteen years an adjuster for the company and that his jurisdiction was over a large territory; that he had authority to settle this claim with the plaintiff; that he made reports of cases investigated and settlements made to his company. He seemed to be a very friendly witness to the defendant at the trial and testified that he was attending the trial of this suit in behalf of the insurance company. He further testified that he was first introduced to plaintiff as "the adjuster" of defendant's insurance company; that he saw plaintiff in May or June at the request of defendant. He testified that his duties were to make "investigations of accidents and adjusting and settling claims," and that he settled plaintiff's claim without the insurance company telling him so to do. In other words he had full discretion in the matter.

There is nothing in the record tending to show that the insurance company had anything to do with this case, at least before suit,

through anyone except Morgan. It shows that he was furnished, or at least, permitted to use, by the insurance company forms for releases and drafts which he had authority to execute for and on its behalf. He executed the draft in this instance and the insurance company honored it and accepted and ratified in its answer, his actions in making the settlement and paying the amount thereof.

Morgan had authority from the company to settle claims without consulting it. Plaintiff's claim was not released or settled if it was attempted to be settled by one not authorized by plaintiff so to do, until the unauthorized acts of his wife were ratified by him. Unless plaintiff ratified the acts of his wife by retaining the money paid under the release, then there never was any settlement of his claim, no contract was ever entered into. If Morgan had authority to settle plaintiff's claim he had power to accept ratification under the circumstances. The relation of Morgan to the Insurance Company was the same at the time the tender was made as it was when the alleged release was signed. However, under plaintiff's evidence there was no valid agreement entered into at the latter time. So its validity depends upon subsequent events.

Suppose there were no question of fraud in this release, but Morgan had talked about signing the release to plaintiff's wife in another room from that occupied by plaintiff and out of plaintiff's presence and hearing; that plaintiff's wife had there said to Morgan "I think the terms of this release will be all right with Mr. Hannah. I heard him say that he is anxious to settle. So I will not bother him about it, as he is sick, but will sign it for him as his agent," and she signed the release. The wife not being authorized to sign for plaintiff no valid contract would have been executed unless and until plaintiff ratified the unauthorized act of his wife in signing. Under these circumstances would not Morgan have had the authority to have called upon plaintiff the next day or the next month or at the end of six months, so long as he remained the adjuster of the company with the same authority, and asked him to ratify the act of plaintiff's wife. One would hardly deny his authority to do this. But suppose that when Morgan so called upon plaintiff, instead of plaintiff ratifying the contract he had said, "Mr. Morgan my wife was not authorized by me to sign the release and I repudiate her act. Here is the money you paid her. I do not want it." Can there be any question but that this would have been a good tender to Morgan as a duly authorized agent of the company? It is a poor rule that does not work both ways.

We do not mean to say that an agent who has no power save to make a contract has authority to subsequently rescind it, but we do say that an agent who has general authority to make a contract can enter into it either directly or through the process of ratification and

that he has authority to manually receive back what he has paid on a contract that never had come into existence, so long as his original authority lasts.

Aside from this, defendant subsequently turned over to Morgan the matter of attending to further adjustment of the matter, showing that the defendant had delegated the whole business to Morgan.

Owing to the fact that the question of agency or the authority of plaintiff's wife to represent him first appears in the reply there was no opportunity for defendant to plead ratification as the code does not contemplate or permit a rejoinder, but under provisions of section 1256, Revised Statutes 1919, "the allegation of any matter in the reply shall be deemed controverted by the adverse party, as upon a direct denial or avoidance." There is no question but that under the circumstances defendant was not required to plead ratification. [Babcock v. Union Rys. Co., 158 Mo. App. 275.]

We have carefully considered the points made in defendant's brief relative to the matters of the admission and rejection of testimony and the giving and refusal of instructions and find no merit in the complaints made in reference thereto, other than in the giving of plaintiff's instruction No. 5.

The judgment is reversed and the cause remanded. *Arnold, J.*, concurs; *Trimble, P. J.*, absent.