105 F.2d 995 (1939)
In re MEISELMAN.
MacLEOD
v.
EDELMAN.
No. 306.
Circuit Court of Appeals, Second Circuit.
July 20, 1939.
*996 Jacob J. Lesser, of New York City (Robert P. Levis, of New York City, of counsel), for appellant.
Jacob Meadow, of New York City, for appellee.
Before SWAN, CHASE, and CLARK, Circuit Judges.
CLARK, Circuit Judge.
On March 25, 1938, Meiselman, a dealer in furs in New York City, bought from Edelman 421 raw mink skins at $15 each, making a total cost of $6,315. He took possession of the skins and gave Edelman a check for $2,000 and two trade acceptances, one for $1,000, due April 25, and one for $3,315, due May 24, 1938. Meiselman immediately offered the furs to Milton Kahn, first at $14 per skin, and then the next morning at $13, asking for a substantial amount in cash and the remainder in good notes. Kahn received the furs into his possession and then sought Edelman as an endorser on the note he proposed to give. Edelman, recognizing the skins, took possession of them and notified Kahn that he claimed them as his own, whereupon Kahn's interest in the skins terminated. It being then late on a Saturday morning, Edelman procured certification of Meiselman's check for $2,000 at the latter's bank. Having consulted counsel over the weekend, on Monday he procured a cashier's check for his certified check, thus making sure that it would be paid; then he wrote Meiselman notifying him that the sale was "rescinded, cancelled, and annulled" for misrepresentation; and finally he completed the day's activities by suing Meiselman in the Supreme Court of New York for rescission of the sale on a complaint wherein he asserted that he had already rescinded it.
Soon thereafter the expected happened, and by April 9, after an earlier assignment for creditors, Meiselman was in bankruptcy  apparently very much so, since it is asserted that his assets were about $2,000 and his liabilities $100,000. The trustee refused to accept the gage of battle tendered in the state court suit, but sought a turn over order from the referee in bankruptcy, who after several adjourned hearings granted it. By this time the mink skins were gone, and, Edelman admitting he was a man of substance, the order was for the payment to the trustee of $6,315, the value of the skins. It is from the affirmance of that order by the District Court and its later refusal to reopen the case that this appeal is taken.
In the proceedings below, two sharply controverted issues developed  the first whether the bankrupt made any false representations, and the second as to the terms of the sale as affecting the necessity of a return of the $2,000 before rescission could be had. Claimant had the misfortune to have his story disbelieved on both points by both the referee and the court, though the former reacted most strongly against his version of the contract itself, while the court objected the more to his claims as to the misrepresentations. His claim as to the contract did not clearly appear from his complaint in the state court, though it was stated in his letter of rescission of March 28, 1938. Since, however, lawyers congenitally *997 hesitate to disclose information in their complaints  a hesitancy not necessarily extended to letters  no point need be based upon that omission. The claim is based on the fact that from an earlier sale of mink skins  one had on March 3  there were still outstanding two trade acceptances, one of $1,800, due on April 13, and one of $800, due on May 3, 1938. So, as Edelman says, the $2,000 given on March 25 was to pay the $1,800 acceptance in full and $200 on the $800 acceptance, leaving a balance thereon of $600. This is contrary to the testimony of the broker present at the sale and to the invoice, prepared by Edelman's wife, showing the $2,000 as payment of the balance due on the present sale of the 421 skins. Edelman's reply is that his wife took her information as to the terms from Meiselman, not from him, since he had stepped out, and with this Mrs. Edelman agrees. In his letter of rescission of Monday, March 28, Edelman returned the $1,800 acceptance, as well as the two given on March 25, and stated that the $800 acceptance was held for the balance due of $600.
The referee characterized this claim as preposterous on the evidence and held that the $2,000 was a cash payment made on the second sale. Accordingly he ruled that there was no rescission for failure to tender back this sum received. After the referee had indicated that he proposed to make the order and at an adjourned hearing held on July 20, 1938, claimant then did make tender of $2,000 to the trustee, which the trustee refused to accept. The referee held that this tender, coming after the adjudication, was too late.
The claimed fraudulent representations were stated in Edelman's verified complaint in the state court suit, in his verified answer to the trustee's petition for the turnover order, and again in his affidavit in the District Court in support of his motion for reargument. They consisted of statements by Meiselman that he was purchasing the skins for the purpose of filling an order which he then had for their immediate resale at a higher price, and that he was a good credit risk, amply solvent and fully capable of paying for the skins upon the dates agreed and intended so to pay for them. The referee held that the proof, including Edelman's testimony, did not show direct representations, that the affidavits were to be treated as only in the nature of pleadings, and hence that no showing of fraud had been made. With this the District Court agreed and in its original order it made this conclusion the chief ground of its decision. Thereupon the claimant sought a reargument or a remand of the case to the referee for the purpose of taking additional testimony on this issue. The court held, however, that full opportunity to present testimony had been accorded at the various adjourned hearings before the referee and, in again confirming the order, stated that in deciding there were no fraudulent representations it did not intend to hold the belated tender sufficient.
We think that a denial of the opportunity to produce further proof was well within the court's discretion. Indeed, it would have served no good purpose, for the nature of claimant's own testimony which would have been produced was already disclosed. The referee and the court had shown the little value they placed upon claimant's own statements, and the court was entitled under the circumstances to decline to reopen the case to hear more of it. Claimant has not been happy in the claims made upon his own testimony, for the latter has seemed too apt to meet all exigencies to inspire confidence. We sympathize with the view of this testimony held below; the case would have been more persuasive had claimant relied only on the admitted circumstances without trying to gild the lily by his testimony. But even if his story of what the bankrupt said is to be discounted, we feel that this does not justify penalizing him by loss of his case if the facts otherwise disclosed point to questions sufficiently serious to make this summary proceeding unjustified.
It is now settled that if there is a real and substantial controversy of law or fact as to property held adversely to a bankrupt  "a contested matter of right, involving some fair doubt and reasonable room for controversy"  the bankruptcy court is "without jurisdiction" to adjudicate the matter, but the trustee must have resort to a plenary suit. Harrison v. Chamberlin, 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897, quoting Board of Education v. Leary, 8 Cir., 236 F. 521, 525; In re Quan Weing et al., 2 Cir., 104 F.2d 112. But the mere assertion of an adverse claim is not enough, and the court may enter upon a preliminary inquiry to determine whether the adverse claim is real and substantial or merely colorable. Id.; May v. Henderson, 268 U. S. 111, 45 S.Ct. 456, 69 L.Ed. 870. Hence we must decide whether this case furnishes *998 such reasonable doubt as to make the referee's order, affirmed by the District Court, unjustified. We do not interpret these decisions as requiring the holding that there is reasonable doubt from the claimant's own testimony alone, when it is disbelieved by the referee, or from his claims of law, when not supported by the precedents. A claimant cannot avoid a summary order by the very audacity of his claims of either fact or law. The referee must proceed to determine whether the adverse claim is "plainly without color of merit and a mere pretense" on a proper weighing of the testimony considered in the light of the claimant's self-interest and a due consideration of existing law. As soon, however, as a substantial claim is disclosed, the rule is mandatory that the court of bankruptcy cannot proceed further.
In the present case the bankrupt's acts, in buying on credit under the circumstances, and the claimant's tender, even though belated, appear to present issues sufficiently controversial as to divest the referee of jurisdiction. The cases show that a purchase on credit by one hopelessly insolvent may be held fraudulent without proof of specific representations. The fact that one who must know that he can never pay proceeds to buy on credit is at least evidence of an intent not to pay and may justify rescission. California Conserving Co. v. D'Avanzo, 2 Cir., 62 F.2d 528, 530 (noted in 46 Harv.L.Rev. 1344 and 32 Mich.L. Rev. 408); Manly v. Ohio Shoe Co., 4 Cir., 25 F.2d 384, 59 A.L.R. 413, with note at page 418 and with cases cited at pages 428-430; Donaldson v. Farwell, 93 U.S. 631, 23 L.Ed. 993; Baldwin v. Childs, 249 N.Y. 212, 214, 163 N.E. 737; Williston on Cont., Rev.Ed., § 1521; 34 Mich.L.Rev. 850. Hence an issue as to fraud sufficient for rescission would seem presented. Though there is not direct evidence in the record, claimant's assertion of the extent of the failure  liabilities fifty times the assets  certainly points to hopeless insolvency, and there is clear evidence of the seller's strenuous efforts to turn the goods into cash or cash equivalent at once and even at a substantial loss, and of his speedy bankruptcy. This issue therefore cannot be deemed foreclosed on this record.
As to the necessity of tendering back the $2,000 in cash received on March 25, we think that even on Edelman's version of the contract of sale, ingenious though that was, restitution of all benefits received was necessary upon rescission. It should be noted that just before this sale Meiselman owed Edelman $2,600 on trade acceptances not then due, that just after the sale the debt, payable in the future, had become $6,915, but that then, by the lucky chance of Edelman's obtaining repossession of the skins, it had been reduced, on his contention, to $600. It would seem equitable, however, that he return to his position wherein he was owed $2,600 before he can be considered to have completed his attempted rescission of the sale. He apparently admits this if the contract was as found by the referee, i. e., that this sale was unconnected with the earlier sale. If, however, the later contract also included a novation of the earlier contract, still the matter was entire and disaffirmance would be invalid unless it covered the whole contract. Williston on Cont. § 1525; Am.L. Inst.Contracts, § 487; Restatement of Restitution, § 65(e); Armstrong v. Herman, 229 App.Div. 162, 241 N.Y.S. 282; Gould v. Cayuga County Nat. Bank, 86 N.Y. 75; United Shoe Machinery Co. of Canada v. Brunet et al., [1909] A.C. 330.
The New York cases are said to be somewhat strict in requiring a tender of benefits received prior to the institution of suit (Williston on Cont. § 1529 note), although some exceptions are stated, and it is pointed out that this is only in a so-called action at law and not a suit in equity. Gilbert v. Rothschild, 280 N.Y. 66, 71-72, 19 N.E.2d 785, 787; E. T. C. Corp. v. Title Guarantee & Trust Co., 271 N.Y. 124, 2 N.E.2d 284, 105 A.L.R. 999. There are, however, cases going so far as to hold that, where a sale on credit has been induced by the fraud of the vendee, the vendor may disregard the terms of postponement and sue at once for the purchase price of the goods. Crossman v. Universal Rubber Co., 127 N.Y. 34, 38, 27 N.E. 400, 13 L.R.A. 91; Heilbronn v. Herzog, 165 N.Y. 98, 103, 58 N.E. 759; Wigand v. Sichel, 3 Keyes 120, *42 N.Y. 120; Williston on Cont. § 1525 (urging, however, that the action should be for the value, not the price, of the goods, on the theory that the proceeding is one of waiver of tort and suit in assumpsit). These cases tend to show further the doubts which may arise as to the law applicable here, although they hardly go to the extent of justifying Edelman's claim that the trade acceptances of March 3, which were not originally tainted by fraud, had become due by reason of the circumstances of the late sale which he is now disaffirming. We *999 think restitution was necessary, and hence we come finally to the important point whether the delayed tender, that made during the course of the hearings on July 20, 1938, might be held sufficient in a plenary suit.
Although the earlier judicial attitude was to differentiate sharply between actions at law, where tender must be made before action brought, and suits in equity, where the rights of the parties could be adjusted by the decree (see 21 Calif.L.Rev. 130), yet the modern tendency is to urge that the rules follow similar lines, whatever the form of proceeding. 29 Col.L.Rev. 791; Williston on Cont. §§ 1529, 1530; Am.L. Inst.Restitution, § 65(d) and (e); cf. Restatement of Contracts, § 481a. Under modern procedure there seems to be no reason for this sharp distinction, but the more satisfactory rule applicable to all forms of actions is to set no arbitrary time limit when offer of restitution must be made, but to consider it in the light of all the circumstances as to whether delay may be an affirmance of the contract or may have prejudiced the rights of others. Thus, Williston cites with approval a judicial statement that the rule as to the duty to offer restitution "is wholly an equitable one; impossible or unreasonable things, which do not tend to accomplish equity in the particular transaction, are not required." Williston on Cont. § 1530, quoting Sloane v. Shiffer, 156 Pa. 59, 64, 27 A. 67. The rule is well stated by Judge Cardozo in a concurring opinion agreed to by the entire court in Brennan v. National Equitable Inv. Co., 247 N.Y. 486, 160 N.E. 924, 926, where he said that "relief will be granted against the consequences of mistake, whether it be characterized as one of fact or law, if there was lacking an intent to ratify, if the absence of this intent was obvious to the other party to the transaction, if no prejudice will be wrought by undoing the apparent choice, and if discovery of the mistake is followed by a prompt return of any benefits received," citing Williston on Cont. § 1591.
The general statements in the authorities indicating that tender may be excused or delayed in certain instances are to the same effect. Am.L.Inst.Contracts, § 480 (2); cf. § 484; Restatement of Restitution, §§ 64, 65, and 69; McClintock, Equity, § 82; Williston on Cont. § 1530; 12 Minn. L. Rev. 412 (criticizing the strictness of the ruling in the lower court in Brennan v. National Equitable Inv. Co., 221 App.Div. 658, 224 N.Y.S. 572). The exceptions to the requirement of tender listed in Gilbert v. Rothschild, supra, show that it can no longer be treated as an absolute or merely arbitrary condition. So it now seems proper generally to hold a delayed tender of restitution nevertheless good if rights of others have not intervened and no one is prejudiced. Clough v. London & North Western Ry. Co., L.R. 7 Ex. 26, 35 (1871). In the Brennan case, an action to set aside a purchase of stock, the plaintiff had received and accepted dividends for more than two years after he had actually claimed rescission and until the corporation became insolvent. The court concluded that he had affirmed the transaction. But Judge Cardozo points out that the plaintiff, even at that date, had made no offer to return the dividends  only to credit them on the amount due him, which would mean a preference  and there had been "a failure to supply the data upon which an equitable readjustment could be accomplished." This indicates that, even in the unusual circumstances of delay there presented, an equitable adjustment was within the contemplation of the court. In Oppenheimer v. Harriman Nat. Bank & Trust Co., 301 U.S. 206, 57 S.Ct. 719, 81 L.Ed. 1042, reversing 2 Cir., 85 F.2d 582, the opportunity to rescind a contract for the purchase of bank stock was not lost by the bank's insolvency. That insolvency of the party guilty of the fraud does not prevent rescission upon restitution of the consideration by the other party to the contract is also held in Cohen v. Ellis, 16 Abb.N.C., N.Y., 320, 349; Stevens v. Hyde, 32 Barb., N.Y., 171; Elliott v. Boaz, 9 Ala. 772; and the general right of a vendor to reclaim his property from a trustee in bankruptcy when his sale was induced by the bankrupt's fraud is well settled. In re Weissman, 2 Cir., 19 F.2d 769, 53 A.L.R. 644, citing cases; California Conserving Co. v. D'Avanzo, supra; In re Gold Band Curtain Co., D.C., 18 F.Supp. 847; Manly v. Ohio Shoe Co., supra, with cases collected in 59 A.L.R. at pages 418-430.
In the present case claimant promptly preserved all the amenities for rescission except the return of the $2,000. He even started a suit for rescission on equitable grounds, wherein tender prior to action is everywhere conceded not to be required. Even if this suit was unnecessary, as the trustee claims, that does not help the latter's case, for the action is not thereby changed into one at law. We think, therefore, *1000 that the later tender may well be held sufficient, unless it is clear that there has been a change of position of the parties to their prejudice. Claimant's offer was to return to the trustee the full amount, and not merely to claim credit upon it for the indebtedness, and hence he has avoided the possibility of a preference found objectionable in the Brennan case. Though the cases cited above indicate the contrary, there might possibly have been a change of position sufficient to prevent rescission, so far as Meiselman was concerned, if the prompt return of this sum would have enabled him to continue in business. But this is obviously not the case if he was as hopelessly insolvent as is asserted; it certainly is not to be presumed in the absence of evidence. So far as the creditors are concerned, they are now as well  probably very much better  off than they would have been had the money been returned on March 28. The delay has meant that the trustee may have $2,000 in his possession for the creditors, whereas otherwise it would almost surely have been dissipated before the adjudication. True, claimant did not tender interest with the principal sum, but that is a small amount and no objection was made on that score. It is obvious that the claimant was attempting and prepared to tender whatever the referee would hold acceptable. Under all the circumstances we cannot say that this tender of July 20 was clearly too late.
It follows, therefore, that there are substantial controversies here, both as to the existence of false representations and as to the effect of the tender, and that consequently the referee had not jurisdiction to pass the summary order. Upon the conclusions we have reached, however, the claimant can claim the benefits of rescission only upon keeping his tender alive. Stevens v. Hyde, supra, 32 Barb. at pages 183 and 184. The order appealed from is therefore reversed and the District Court is directed to remand the case to the referee with instructions to dismiss the trustee's petition, without prejudice to the trial of the issues here involved in an action appropriate for that purpose, provided that the claimant keeps alive his tender of restitution, and upon the claimant's failure to do so, to reënter the summary order.
Reversed with directions.
CHASE, Circuit Judge (concurring).
I agree that an adverse controversy beyond the summary jurisdiction of the court was presented unless the tender made to the trustee (for present purposes to be treated as adequate to support a rescission, if kept good) came too late. The intervention of bankruptcy proceedings would not have foreclosed the right of appellant to rescind promptly upon gaining knowledge that the bankrupt had fraudulently made the purchase. In re Weissman, 19 F.2d 769, 53 A.L.R. 644. Compare, Oppenheimer v. Harriman Nat. Bank & Trust Co., 301 U.S. 206, 214, 57 S.Ct. 719, 81 L.Ed. 1042. Had he made no prior inadequate tender, it would seem that his tender to the trustee would have been prima facie sufficient to make, in connection with his evidence of fraud, his claim of right to retain the skins substantial and adverse. It was, indeed, not made adequate until some four months after the appellant knew the facts upon which he based his claim of fraud but there seems to have been no change during that time whereby third parties acquired any rights which could be adversely affected by such delay as took place.
Decision as to summary jurisdiction must turn, I think, upon whether or not under the circumstances stated by Judge CLARK the position at first taken by the appellant that the $2,000 was not part of the purchase price of the skins estopped him from later conceding that it was and thereby mending his hold, so to speak, only when the weakness of his evidence as to the terms of payment of the purchase price apparently made him think that advisable.
Because this record does not show that appellant was not entitled to increase the amount of his tender when and as he did to like effect as though he had at first included the $2,000, we cannot say that his claim is merely colorable and he is, therefore, entitled to have his rights determined in a plenary suit.