[Civ. No. 16150.   Second Dist., Div. Three.   Sept. 13, 1948.]

UNION PACIFIC RAILROAD COMPANY (a Corporation), Appellant, v. LAWRENCE ZIMMER, Respondent.

E. E. Bennett, Edward C. Renwick and Malcolm Davis for Appellant.

Hildebrand, Bills & McLeod and Sheridan Downey, Jr., for Respondent.

SHINN, P. J.—In March, 1941, while working as a switchman in the Union Pacific Railroad yards at Cheyenne, Wyoming, respondent Lawrence Zimmer sustained a fractured left elbow under circumstances concededly giving rise to a cause of action in his favor against his employer, Union Pacific Railroad Company, under the Federal Employers' Liability Act, (35 Stats. 65 et seq., 45 U.S.C.A. §§ 51-60). On the second day after the accident, respondent's arm was operated on by Dr. Fox, a surgeon in the employ of the railroad, and was placed in a cast. About May 6, Dr. Fox removed the cast, and told respondent, "Your arm isn't going to be stiff. Your arm is all right. You go down to Omaha, they want to see you; get it settled up and get back to work." Respondent proceeded to Omaha, where, on May 12, he met Harry I. Benon, who on a prior occasion had represented that he was associated with attorneys for the Brotherhood of Railway Trainmen, and had offered to help respondent reach a settlement with the railroad. Benon took respondent to the office of Dr. Fouts, a private physician, for an examination which included the taking of X-rays. Dr. Fouts told respondent that it would take some time, but that he "would have a good arm." A written report of this examination, which respondent read, disclosed that he had an ununited fracture of the olecranon process of the left ulna, and that bony union had not yet occurred. The report concluded with these words: "This man has not reached the maximum improvement. It is less than 8 weeks since his operation, and the arm is still sore. He has a fairly good range of motion and good flexion strength. The extension is somewhat weak. This will improve as time goes on and the soreness gets out of the elbow. In my opinion he will not have reached his maximum improvement until 3 or 4 months from this date."

Respondent and Benon next went to the railroad's claim department, and claim agent Oberlander took them to the office of two company surgeons, Drs. Nilsson and Langdon,

for an examination of respondent's arm. These doctors took further X-rays and viewed the arm through a fluoroscope, but refused to discuss the injury. Dr. Nilsson, however, told respondent, "Your arm will come out all right," and Dr. Langdon said, "I can't say anything; but you will have a good arm anyway." The latter also stated that he agreed with Dr. Fouts' report. On the following day, May 13th, 1941, respondent and Benon engaged in an all-day bargaining session with Oberlander, which resulted in a settlement of $965, and a release was then executed. By its terms, this instrument purported to release Union Pacific Railroad Company "from all claims and causes of action that now exist or may hereafter accrue, for damages for any and all personal injuries, INCLUDING THOSE INJURIES, IF ANY, WHICH ARE UN-KNOWN TO ME AT THE PRESENT TIME AND WHICH MAY HERE-AFTER APPEAR, and for complications arising from all injuries or treatment thereof, whether such injuries are known or un-known . . . and I do hereby release all claims for all my injuries, though such injuries are other and greater than I now believe them to be and though Union Pacific Railroad Company may be absolutely liable therefor." Near the bottom of the instrument, in the handwriting of respondent, appear the words, "I have read the foregoing receipt, release, and contract and fully understand the same," followed by his signature.

In July, 1941, respondent attempted to return to work, but was unable to perform his duties as a switchman because of the impaired condition of his left arm. He was then sent to Denver, where Dr. Grieg, another company surgeon, operated on the elbow and wired it in an attempt to bring about a union of the broken bone. This operation was unsuccessful, for the wires subsequently broke. Another operation in December, 1941, likewise was unsuccessful. At the time of the trial, the fracture was still ununited, resulting in an apparently per-manent partial disability of the left arm.

In January, 1942, respondent again called on plaintiff's claim agent in Omaha with a view to obtaining further com-pensation. The agent prepared an affidavit, to be referred to in greater detail hereafter, which respondent signed. Later, negotiations were continued at Cheyenne, during which Mr. Stoddard, the local superintendent, told respondent that he wanted to see him "get a square deal," and that he thought the company would be willing to approve an additional pay-ment of $2,500 or $2,600 for the additional wages lost by re-spondent. No such adjustment was ever consummated, however.

Meanwhile, respondent had been gradually spending the original settlement proceeds for living expenses, and these funds were exhausted by June, 1942. On June 20th, he contacted his present attorney who, on July 7th, by letter, tendered repayment of the consideration and interest thereon, and attempted to rescind the release on the grounds of fraud and mistake. The tender was refused, and Union Pacific Railroad Company subsequently brought this action, pursuant to section 1060 of the Code of Civil Procedure, for a declaration of its rights under the release. The trial court found in favor of appellant on the issue of fraud, but determined that the release was not valid and binding for the reason that it was entered into under a mutual mistake of fact as to the seriousness and duration of respondent's injury, and that it had been effectively rescinded. From the judgment entered upon these findings, Union Pacific Railroad Company brings this appeal.

We are presented at the outset with the question of which law the California court should apply in determining the validity of this release, whether the law of the forum, the law of the place of execution, or federal law. Ever since the Supreme Court, in *Garrett* v. *Moore-McCormack Co.*, 317 U.S. 239 [63 S.Ct. 246, 87 L.Ed. 239], decided that the federal admiralty rule governed the burden of proof of establishing a release in an action brought in a state court under the Jones Act ([41 Stats. 988 et seq.], 46 U.S.C.A. § 861, et seq.), it has been uniformly held that the validity and legal effect of a release from liability under the Federal Employers' Liability Act (45 U.S.C.A. §§ 51-60), are also governed by federal rather than state law. (*Ricketts* v. *Pennsylvania R. Co.*, (2 Cir.) 153 F.2d 757, 759; *Irish* v. *Central Vermont Ry.*, (2 Cir.) 164 F.2d 837, 839; *Thompson* v. *Camp*, (6 Cir.) 163 F.2d 396, 400.) This rule is in harmony with the policy of uniform interpretation embodied in the established doctrine that general legal principles governing rights and liabilities under the Federal Employers' Liability Act are matters of federal law as to which the decisions of federal courts are controlling (*Chesapeake & Ohio R. Co.* v. *Kuhn*, 284 U.S. 44 [52 S.Ct. 45, 76 L.Ed. 157]; *Weiand* v. *Southern Pacific Co.*, 34 Cal.App.2d 500, 504 [93 P.2d 1023]; *King* v. *Schumacher*, 32 Cal.App.2d 172, 177 [89 P.2d 466]), and we adopt it as a basis for the present decision.

The United States Supreme Court has recently held, contrary to respondent's contention, that releases such as the one presently being considered are not violative of section 5 of the

Federal Employers' Liability Act (35 Stats. 66, 45 U.S.C.A. § 55), which provides that any contract to enable any carrier to "exempt itself from any liability created by this chapter shall to that extent be void." (*Cullen* v. *Pennsylvania R. Co.*, 332 U.S. 625 [68 S.Ct. 291, 92 L.Ed. ——, ——].) A majority of the court in the Cullen case, which was decided subsequent to the filing of respondent's brief herein, also expressly rejected a contention similar to that made by respondent, that releases under the act should, by reason of a claimed analogy, be construed by reference to the somewhat more favorable rules of decision which admiralty courts have traditionally applied to invalidate releases executed by seamen, the so-called "wards of admiralty" (see *Hume* v. *Moore-McCormack Lines*, 121 F.2d 336). The court held that such a change in the law could be made only by Congress, and until Congress should so act, "the releases of railroad employees stand on the same basis as the releases of others."

Many decisions in both federal and state courts have affirmed the principle that a release of a claim for personal injuries may, under proper circumstances, be avoided on the ground of mutual mistake as to the nature or seriousness of the injury. (See cases cited in anno. 117 A.L.R. at p. 1030.) Each case, of course, must be considered on its own facts, and the question of mutual mistake is normally one for the trier of fact. (45 Am.Jur., Release, § 49, p. 708.) It is well settled, however, that the mere fact that the release is extremely comprehensive in terms, and purports to be a complete discharge from all claims arising out of the accident, and is understood as such by the releasor, will not prevent its avoidance where proper grounds therefor exist. (*Tulsa City Lines* v. *Mains*, (2 Cir.) 107 F.2d 377, 381; *Atlantic Greyhound Lines* v. *Metz*, (4 Cir.) 70 F.2d 166, 168; see also *Bonici* v. *Standard Oil Co.*, (2 Cir.) 103 F.2d 437, 438; *Southwest Pump & Machinery Co.* v. *Jones*, (8 Cir.) 87 F.2d 879; *Great Northern Ry. Co.* v. *Reid*, (9 Cir.) 245 F. 86 [157 C.C.A. 382]. Accord: *Hudgins* v. *Standard Oil Co.*, 136 Cal.App. 44 [28 P.2d 433]; *Rider* v. *Kansas City Terminal Ry. Co.*, 112 Kan. 765 [212 P. 678].)

Appellant's chief contention is that the evidence fails to disclose any mistake as to present or past facts, and on the contrary does show only mistaken opinions as to the future outcome of a known injury. We think the facts presented cannot be classified in such an unequivocal fashion. Initially it may be noted that appellant appears to have overlooked Dr.

Fox's flat statement, "Your arm is all right," which, considered with the accompanying direction to "get it settled up and get back to work," would be difficult to construe in any sense other than as an assertion as to the then existing condition of the injured member. Moreover, the statements made by Drs. Fox, Nilsson, and Langdon to the effect that respondent's arm would not be stiff, that it would come out all right, and that he would have a good arm, need not be interpreted solely as declarations of opinion as to future developments, but may also be fairly understood, by way of reasonable implication, as expressions of fact as to the seriousness of the injury sustained and the present condition of the patient. Dr. Fouts' written report was clearly susceptible of a like interpretation, particularly when considered in relation to his oral statement that respondent would have a good arm. Respondent testified that he understood the words, "maximum improvement," as contained in the written report, to mean "will be all right." As was said in *Scheer* v. *Rockne Motors Corp.,* (2 Cir.) 68 F.2d 942, 945 (holding a release voidable for mutual mistake), "There is indeed no absolute line to be drawn between mistakes as to future, and as to present facts. To tell a layman who has been injured that he will be about again in a short time is to do more than prophesy about his recovery. No doubt it is a forecast, but it is ordinarily more than a forecast; it is an assurance as to his present condition and so understood." (See also, *Tulsa City Lines* v. *Mains,* (10 Cir.) 107 F.2d 377, 381.)

The facts presented strongly repel the suggestion that the railroad intended the single payment of $965 to purchase absolution from an injury as serious and permanent as the present one subsequently turned out to be. The apparent willingness of the company officials to negotiate for a further settlement in the early part of 1942, on the basis of additional time lost, lends weight to this view. On the other hand, it is inconceivable that respondent would have accepted a sum equal to a few months' lost wages in full settlement for a permanently disabling injury. We think the evidence as a whole supports the conclusion that both parties shared a mistaken understanding that the condition of respondent's arm was not serious, but was such that any temporary disability resulting therefrom would be of reasonably short duration. On this showing, relief was properly granted. (See *Steele* v. *Erie R. Co.* (D. Ct. N. Y.), 54 F.2d 688, 689; *Scheer* v. *Rockne Motors Corp., supra; Thompson* v. *Camp,* (6 Cir.) 163 F.2d 396, 401;

*Great Northern Ry. Co.* v. *Fowler,* (9 Cir.) 136 F. 118 [69 C.C.A. 106]; *Lion Oil Refining Co.* v. *Albritton,* (8 Cir.) 21 F.2d 280.)

Appellant relies upon *Harmon* v. *United States,* (5 Cir.) 59 F.2d 372, *Chicago & N. W. Ry. Co.* v. *Wilcox,* (8 Cir.) 116 F. 913 [54 C.C.A. 147], and *Sitchon* v. *American Export Lines,* (2 Cir.) 113 F.2d 830, as requiring a contrary conclusion. We think none of these cases is controlling. The release in the Harmon case was attacked on the ground of incapacity of the releasor, and no issue of mistake was involved. In the Wilcox case, the court held a release to be binding on the ground that the evidence was insufficient to support a finding of mutual mistake, where the plaintiff, who had sustained a badly broken femur, was fully informed of the serious nature of her injury, and was told by her physician that there was no certainty of recovery, and that injuries like hers generally resulted in permanent disability. The facts of that case manifestly go far beyond those presently being considered. In holding a release to be binding, the court in the Sitchon case apparently regarded as controlling the fact that it had been executed solely on the basis of the independent advice of the releasor's own physician and attorney, with no representations whatsoever having been made by company doctors. The opinion on this point is not persuasive, for, on principle, it would seem immaterial what the source of the information giving rise to a mutual mistake might be. (*Tulsa City Lines* v. *Mains, supra,* 107 F.2d 377, 382.) In any event, it is apparent that the court was there confronted with a situation quite different from that in the case at bar, and the decision is not controlling. We hold the finding that the present release was entered into on the basis of a mutual mistake of material fact to be fully supported by the evidence.

Appellant next contends that the release is nevertheless an existing and binding contract on the ground that any right which respondent may have originally had to rescind it was extinguished by an implied ratification thereof by conduct (see 12 Am.Jur. 508, 1030) prior to respondent's letter and tender of repayment in July, 1942, which, it is conceded, would have otherwise constituted a sufficient rescission. As proof of such ratification, reliance is placed chiefly on the continued retention and spending of the proceeds of settlement by respondent long after it is claimed he became fully cognizant of the facts upon which the subsequently attempted rescission was predicated.

■ The fundamental test of ratification by conduct is whether the releasor, with full knowledge of the material facts entitling him to rescind, has engaged in some unequivocal conduct giving rise to a reasonable inference that he intended the conduct to amount to a ratification. (23 R.C.L. 390, quoted in *Smallwood* v. *St. Louis-San Francisco R. Co.*, 217 Mo.App. 208 [263 S.W. 550, 558]; *Mensforth* v. *Chicago Brass Co.*, 142 Wis. 546 [126 N.W. 41, 42-3, 512, 135 Am.St.Rep. 1084].)

■ In accordance with this rule, it is well settled that the use or retention of the settlement proceeds by one *sui juris* who has knowledge of the material facts, will amount to a ratification of an otherwise voidable release if the retention is for an unreasonable time under the circumstances of the case. (45 Am.Jur., Release, § 25, p. 690; anno. 76 A.L.R. 345.) Whether the releasor has such knowledge, and whether retention has been for an unreasonable length of time, are normally questions for the trier of fact. (See *Komer* v. *Shipley*, (5 Cir.) 154 F.2d 861, 866; *Capital Traction Co.* v. *Sneed*, (App.D.C.) 26 F.2d 296; *Marple* v. *Minneapolis & St. L. Ry. Co.*, 115 Minn. 262 [132 N.W. 333, 334, Ann.Cas. 1912D 1082]; *Hannah* v. *Butts*, 222 Mo.App. 1098 [14 S.W.2d 31, 38]; *Butler* v. *Gleason*, 214 Mass. 248 [101 N.E. 371, 373]. Cf., *Chicago, St. P. & K. C. Ry. Co.* v. *Pierce*, (7 Cir.) 64 F. 293 [12 C.C.A. 110].)

■ The record fails to indicate exactly when respondent came to a realization that his elbow was not going to fully recover from its injury. The need for two operations subsequent to the execution of the release may have created some uncertainty in his mind as to the ultimate recovery, but mere uncertainty is not knowledge. The record justifies an inference that he did not become fully cognizant that the doctors upon whom he had relied in signing the release had been mistaken about the seriousness of his injury, until a sufficient period of time had elapsed after the last operation to prove that it, too, had been unsuccessful. Furthermore, the statement made by appellant's superintendent during the discussions of January, 1942, that a further substantial payment to respondent would be recommended and probably approved, could have been properly considered by the court as bearing upon the issue of reasonableness of the retention of consideration thereafter.

Appellant claims that respondent's affidavit, which was executed on January 15, 1942, at the request of appellant's claim agent, constituted an express ratification of the release.

This affidavit contained *inter alia,* an account of the accident and of the circumstances preceding the execution of the release in suit, and stated: ''The settlement made by Mr. Oberlander was up and above the board in every way—no settlement was made on time I would lose account the accident—settlement was up and above board and I was satisfied with the settlement, read over the release, fully understood it after I read it, and I knew it was a complete release of all claims for known and unknown injuries.'' This statement negates the existence of fraud in reaching the settlement, but in the absence of proof of full knowledge by respondent of the facts of the mistake it cannot be understood as an express ratification thereof so as to preclude a seasonable rescission on the latter ground. On the present record, the legal effect of the quoted statement can be at best no different from that of its counterpart in the release itself, which as we have seen, is no bar to a rescission.

The cases cited by appellant do not require a different conclusion. *Merwin* v. *New York, N. H. & H. R. Co.,* (2 Cir.) 62 F.2d 803, clearly has no application to the present case, for there the evidence conclusively showed an express ratification on several different occasions by one with full knowledge of facts entitling him to rescind the release. Other cases cited, such as *Colorado Springs & I. Ry. Co.* v. *Huntling,* 66 Colo. 515 [181 P. 129], and *Texas & P. Ry. Co.* v. *Poe,* 131 Tex. 337 [115 S.W.2d 591], involved instances of incapacity or fraud in the execution of releases, the true facts of which very shortly thereafter became fully known to the respective releasors; and, on the undisputed evidence as to the length of time during which no offer of rescission or tender of repayment was made, it was held that the question of ratification was one for the court rather than for the jury. On the facts before us, however, we cannot say as a matter of law that respondent retained the proceeds of settlement for such an unreasonably long period of time after becoming fully cognizant of the facts entitling him to rescind, as to amount to a ratification of the release, and the trial court's implied findings on the issue may not be disturbed.

The judgment is affirmed.

Wood, J., and Vallée, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 8, 1948.