## GRAHAM v. ATCHISON. T. & S. F. RY. CO.
### No. 12099.

United States Court of Appeals
Ninth Circuit.

Aug. 30, 1949.

Rehearing Denied Oct. 11, 1949.

Philander Brooks Beadle and Ernest E. Emmons, Jr., San Francisco, Cal., for appellant.

Robert W. Walker and H. K. Lockwood, Los Angeles, Cal., Gus L. Baraty and George Aaron Smith, San Francisco, Cal., for appellee.

Before GARDNER, Chief Judge,* HEALY, Circuit Judge, and YANKWICH, District Judge.

YANKWICH, District Judge.

The appellant, George H. Graham, the plaintiff below, a brakeman in the employ of the appellee, the defendant below, be-

* Chief Judge, United States Court of Appeals for the Eighth Circuit, designated to sit in this court.

gan, on August 30, 1946, an action for damages for personal injuries under the Federal Employers' Liability Act, 45 U.S. C.A, § 51 et seq. The defendant, Atchison, Topeka and Santa Fe Railway Company, is a corporation organized under the laws of the State of Kansas, engaged in the business of a common carrier by railway, in interstate commerce, in the State of California and other states.

## I. The Facts in the Case.

The plaintiff was injured on July 6, 1945, at Needles, California. He had begun to work at the hour of 10:00 A.M. of that day at Seligman, Arizona. At the time of the accident, he was working as a flagman on a freight train of about 70 cars. He was the flagman at the rear end of the train, in the caboose. He arrived in the yard at Needles at 1:00, the train coming to a final stop inside number 20 track. With the train coming to a stop, the plaintiff's duties ended. Track 20 was clear of the main line. The plaintiff took down the lanterns from the rear of the caboose, crawled into the cupola of the caboose and sat down, waiting for his train to move farther into the freight yard. While there, he first saw in the window of the caboose the reflection of an approaching train. This having drawn his attention to the approaching train, he turned around and looked back. The approaching train was anywhere from 600 to 1000 feet away, down the track. Thinking that the train was coming a little fast, the plaintiff put his body out of the cupola window and put out his lamp to slow down the approaching train. But it kept on coming, and gave no response to the signal. So he went back to the platform and put out his lamp to slow it down. However, the approaching train was too close to enable the plaintiff to reach for the fusee and break it. Being unable to do anything about the matter, the plaintiff went back into the caboose and jumped to the cupola, hoping for a chance to get out of the cupola window. He did not, in fact, do so. For, to one side of him was the river and to the other were piles of ties. He, therefore, took hold of a grabiron and when the train hit the caboose he was pitched up into the air and down on the floor. As he was trying to get up on his feet, a second crash occurred. He managed to crawl into a passenger train, which took him to the station. He declined to go to the hospital and was driven by another employee to his cottage in Needles. He then drove to his home in Searchlight, Nevada. He stayed in bed for about three days. On July 9, he drove to Boulder City and saw a physician, Dr. Fenlon, who ordered him to bed. No X-rays were taken. On July 17 or 18, he saw Dr. Price, in Needles, who told him that he had "some bad bruises and contusions" and gave him some pills to relieve the pain. Early in August he saw another doctor, Dr. Holz, who ordered him to enter the Santa Fe Hospital at Los Angeles. At the time he was suffering pains mostly "in his hips, back, left shoulder and back of the head." He entered the hospital at Los Angeles on August 14. A few days after his admission, they took X-rays. Otherwise, his treatment consisted of "heat treatments and pills." He left the hospital voluntarily on August 24 and went back first to Needles, then to Searchlight. While in the hospital, he talked, on August 18, to Dr. Morrison, Chief Surgeon of the hospital, who told him to go back to work. The plaintiff gave this version of his conversation with Dr. Morrison:

"Q. And what did he tell you? A. Well, he told me to go back to work if I possibly could, that the company was very short of men and that they needed to keep the trains operating—the war was still on, and to go back and take it easy, that I would be all right in thirty or sixty days. So he gave me a release and I went back, but I didn't go to work right at that time.

"Q. Dr. Morrison told you that you would be all right within thirty to sixty days? A. Thirty to sixty days, to take it easy.

"Q. Did he tell you to go back to work at the same type of work that you had been doing before? A. No, he didn't.

"Q. What did he tell you? A. Told me to take a passenger job, take it easy."

Upon reaching the hospital he was handed a document certifying to his discharge

from further treatment. Again quoting from the record:

"Q. (Mr. Emmons): Now at the time that you talked to Dr. Morrison, was there any question regarding broken bones? A. No, none at all.

"Q. Did he tell you that there were no broken bones? A. Told me—he didn't say there was no broken bones, he just said, 'Go back and take it easy, you will be all right, you can get along.'

"Q. Did you ever see the x-rays? A. No.

"Q. That the Santa Fe Railroad took? A. No, they wouldn't show them to me.

\* \* \* \* \*

"Q. (Mr. Emmons): Mr. Graham, did you have any knowledge of any other injuries, other than those which you discussed with the doctor? A. No.

"Q. And what injuries were discussed with the doctor? A. Well, I told him my hip was hurting me, and my back, through the small of my back, and my shoulder. He felt me over. Well, he says, 'You'll be all right; take it easy.' He said, 'Get back on the job.' He repeated that several times, to get back on the job, that we needed every man we could get, that war was still on."

The facts relating to the release, signed by the plaintiff, as told by him from the stand were these:

A Mr. Sims, Assistant Claims Adjuster in Los Angeles, called him while he was at the hospital. He took a taxi and met Sims in his office in the Santa Fe Building, who told him that he wished to discuss the adjustment of the claim. He returned to Needles. Nothing definite came of the meeting. About September 25, he saw a Mr. Evan Lewis, Claim Adjuster, who, at first, offered him $1200 or $1300 in settlement of the claim, stating, however, that "the Los Angeles office" would not accept it. He finally went to the Los Angeles claims office and signed a release on October 1, 1945, receiving at the same time, a check for $1050. The release reads:

"For the sole and only consideration of $1,050, the receipt of which is hereby acknowledged, I hereby release and forever discharge the Atchison, Topeka & Santa Fe Railroad Company, Coast Lines, its agents and employees from any and all claims and demands which I have now or may hereafter have on account of any or all injuries, including any injuries which may hereafter develop as well as those now apparent, sustained by me at or near Needles, California, on or about July 6, 1945, while employed as brakeman; also for loss or damage to personal property. In making this settlement, I am not relying upon any statement made by any agent or official of said Company as to what my injuries are or how serious they are or when or to what extent I may recover therefrom. It is definitely understood that in making this settlement, no promise or representation has been made relative to future employment.

"I have read the above release and understand the same. In Witness Whereof, I hereunto set my hand and seal this first day of October, 1945.

"G. H. Graham."

The plaintiff worked for a period of forty-five days after his release from the hospital. He was discharged by the defendant in February, 1946, for reasons not connected with the injury. On February 13, 1946, an X-ray of the spine was taken by Dr. Fenlon, who then advised the plaintiff that he had an injury to his spine. Medical testimony at the trial was to the effect that these X-rays showed the identical crushed disc disclosed by X-rays taken at the hospital in August, 1945.

The answer of the defendant filed September 25, 1946, pleaded, in bar, the release executed October 1, 1945. Plaintiff's present counsel were substituted on November 24, 1947. On November 25, 1947, they wrote a letter to defendant's attorneys in Los Angeles, which read:

"November 25, 1947.

"Messrs. Sievert and Ewing,

"Attorneys at Law,

"121 East 6th Street,

"Los Angeles, California.

"Re: Graham vs. Santa Fe Railroad.

"Gentlemen:

"Enclosed please find file-marked copy of Substitution of Attorneys in the cap-

tioned case, wherein this office replaces Emmett R. Burns, Esq., as attorney of record.

"Also enclosed, please find a Notice of Rescission of Release and Offer to Restore Consideration executed by Mr. Graham. Kindly advise us of your wishes in this respect.

"Very truly yours,

"Philander Brooks Beadle,

"By...................."

At the trial, the attorneys for defendant admitted receipt of the letter. Without objection, it was received in evidence and read to the jury. The notice of rescission of release and offer to restore consideration, to which the letter referred, was not offered in evidence and was not read to the jury. The plaintiff testified to his ability actually to tender to the defendant the amount received in settlement. Other testimony will be referred to further on in the opinion.

At the conclusion of plaintiff's case, the defendant offered as their only witness, Dr. Ralph Soto-Hall, who gave medical testimony as to the nature and extent of the injuries. The defendant then moved for a directed verdict, Federal Rules of Civil Procedure, Rule 50, 28 U.S.C.A., upon the general ground that there was no evidence before the court to impugn the validity of the release; and, more particularly, that there was *no evidence to show that the release was obtained by fraud, duress or undue influence.*

The court granted the motion, stating that "No issue of fact with respect to the second and separate defense raised by the answer (which pleaded the release) requires a decision by the jury."

One of the jurors was appointed foreman, and the court directed the jury to return a verdict in favor of the defendant, which they did on August 19, 1948. On August 20, 1948, judgment on the verdict was entered in favor of the defendant.

The appeal is from the judgment on the verdict. It challenges the correctness of the action of the trial court in directing a verdict.

## II. The Facts Called for Submission to the Jury.

In approaching the matter, we start with the fact that, because of the nature of the Federal Employers' Liability Act and its aim to aid the employee injured in the course of his employment, courts do not encourage any action which deprives the employee of the right to have determined by a jury the controversy between him and his employer on the merits. Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520; Tiller v. Atlantic Coast Line R. Co., 1945, 323 U.S. 574, 65 S.Ct. 421, 89 L.Ed. 465; Jeseonowski v. Boston & Main R., 1947, 329 U.S. 452, 67 S.Ct. 401, 91 L.Ed. 416, 169 A.L. R. 947; Ellis v. Union Pac. R. Co., 1947, 329 U.S. 649, 653, 67 S.Ct. 598, 91 L.Ed. 572, Callen v. Pennsylvania R. Co., 1948, 332 U.S. 625, 68 S.Ct. 296, 92 L.Ed. 242; Wilkerson v. McCarthy, 1949, 336 U.S. 53, 69 S.Ct. 413; Lukon v. Pennsylvania R. Co., 3 Cir., 1942, 131 F.2d 327; Croker v. Central Vermont Ry., 2 Cir., 1949, 172 F.2d 324. See, also Raymond J. Moore, Recent Trends in Judicial Interpretation in Railroad Cases Under Federal Employers' Liability Act, 1946, 29 Marquette Law Rev., 73.

Assuming, therefore, for the moment, that the plaintiff was not foreclosed from questioning the release, the evidence given before the court by him—the interpretation of which must be most favorable to him—see, Gunning v. Cooley, 1930, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Schad v. Twentieth Century-Fox, 3 Cir., 1943, 136 F.2d 991, 993; Meyonberg v. Pennsylvania R. Co., 3 Cir., 1947, 165 F. 2d 50, 52; Stueber v. Admiral Corp., 7 Cir., 1949, 171 F.2d 777, 779, showed a mistake on his part which went to the essence of the contract and which, as will presently appear, entitled him, under the law, to have the question of the validity of the release submitted to the jury. Butte Copper & Zinc Co. v. Amerman, 9 Cir., 1946, 157 F. 2d 457; Engstrom v. Auburn Automobile Sales Corp., 1938, 11 Cal.2d 64, 77 P.2d 1059, 1061. We stop to inquire what law

governs. Ever since the enactment of the Federal Employers' Liability Act, the courts have held that questions arising under it must be determined by Federal, not by State law. Chicago, M. & St. P. Ry. v. Coogan, 1926, 271 U.S. 472, 473, 46 S.Ct. 564, 70 L.Ed. 1041; Chesapeake & Ohio Ry. Co. v. Kuhn, 1931, 284 U.S. 44, 52 S. Ct. 45, 76 L.Ed. 157; Jacobs v. Reading Co., 3 Cir., 1942, 130 F.2d 612.

These rulings are consonant with the general tendency to apply Federal law to all cases which call for the interpretation of Federal statutes creating rights. This works for uniformity. A contrary rule would be disastrous to the establishment of a jurisprudence on strictly Federal subjects. And this would be especially true in matters arising under the Federal Employers' Liability Act, where the employee may resort to the State courts to enforce his rights. If uniformity were not assured through the integrated Federal judicial system, the employee would be subjected to the constant ebb and flow of local judicial opinion in the State where he may bring his action. Hence the logic of the attitude of the courts in this matter.

In applying this principle, courts have held, in very recent years, that the validity of a release, entered into by an employee entitled to the benefits of the Federal Employers' Liability Act, is also governed by Federal law. While the Supreme Court has not ruled on the question under this particular law, we have an analogous ruling made under the Merchant Marine Act, 46 U.S.C.A. § 688, that a seaman's attack on the validity of a written release, was governed by Federal, not local law. Garrett v. Moore-McCormack Co., Inc., 1942, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239. Several courts of appeal—notably those

for the second and sixth circuits—have taken their clue from this opinion and applied it to the Federal Employers' Liability Act. Ricketts v. Pennsylvania R. Co., 1946, 2 Cir., 153 F.2d 557, 164 A.L.R. 387; Irish v. Central Vermont R., 2 Cir., 1947, 164 F.2d 837; Thompson v. Camp, 6 Cir., 1947, 163 F.2d 396.

■ But, whether we consider the problem from the standpoint of Federal or State law, the result is the same. Generally, mistake or fraud are recognized grounds for the rescission of agreements of compromise and release of any character, including those made under this Act. Great Northern R. Co. v. Fowler, 9 Cir., 1905, 136 F. 118; Armour & Co. v. Renaker, 6 Cir., 1913, 202 F. 901; Great Northern R. Co. v. Reid, 9 Cir., 1917, 245 F. 86; Scheer v. Rockne Motors Corp., 2 Cir., 1934, 68 F. 2d 942; Robert Hind, Ltd., v. Silva, 9 Cir., 1935, 75 F.2d 74; Southwest Pump & Machinery Co. v. Jones, 8 Cir., 1937, 87 F.2d 879, per Gardner, C. J.; Tulsa City Lines v. Mains, 10 Cir., 1939, 107 F.2d 377; Komer v. Shipley, 5 Cir., 154 F.2d 861; Thompson v. Camp, supra; Ricketts v. Pennsylvania R. Co., supra; Irish v. Central Vermont R., supra; United States v. Jones, 9 Cir., 1949, 176 F.2d 278, 285–286.

The California cases accord.[1]

■■ Under the teachings of these cases, the statement of a physician as to the condition of a patient *is a statement of fact.* As said by the Court in Scheer v. Rockne, supra [68 F.2d 945]: "There is indeed no absolute line to be drawn between mistakes as to future, and as to present facts. To tell a layman who has been injured that he will be about again in a short time is to do more than prophesy about his recovery. No doubt it is a forecast, but it is ordinarily more than a forecast; it is an as-

---

[1] From the many California cases which declare the same principles, we select the following as illustrative: O'Meara v. Haiden, 1928, 204 Cal. 354, 268 P. 334, 60 A.L.R. 1381; Wilson v. San Francisco–Oakland Terminal Railways, 1920, 48 Cal.App. 343, 191 P. 975; Hudgins v. Standard Oil Co., 1933, 136 Cal.App. 44, 28 P.2d 433; Matthews v. Atchison, T. & S. F. Co., 1942, 54 Cal. App 2d 549, 129 P.2d 435; Wetzstein v.

Thomasson, 1939, 34 Cal.App.2d 554, 93 P.2d 1028; Backus v. Sessions, 1941, 17 Cal.2d 380, 110 P.2d 51; Jordan v. Guerra, 1943, 23 Cal.2d 469, 144 P.2d 349; Union Pacific R. Co. v. Zimmer, 1949, 87 Cal.App.2d 524, 197 P.2d 363. Many of these cases were reviewed and applied by this Court in Pacific Greyhound Lines v. Zane, 1947, 9 Cir., 160 F.2d 731.

surance as to his present condition, and so understood."

What may be the result if the patient acts upon the physician's statement was summed up by the Court in Matthews v. Atchison, T. & S. F. Ry. Co., supra, 54 Cal.App.2d, at page 558, 129 P.2d at page 441: "It was believed by plaintiff, and if it was also believed by the physician, the case is one of mutual mistake. If the statement was not believed by the physician, we have a case of fraud. In either case the plaintiff was entitled to rescind, and it is not disputed here that the steps he took were sufficient to accomplish that result."

Similar language is found in Union Pacific R. Co. v. Zimmer, supra, 87 Cal.App. 2d at page 530, 197 P.2d at page 367.

It is clear from the testimony that the X-rays taken at the hospital in August, 1945, showed the crushed disc. The plaintiff was not informed of that fact; he did not learn of it until February 13, 1946, when so informed by Dr. Fenlon.

In the present state of the record, we cannot say whether Dr. Morrison's failure to disclose the true condition was willful or whether he did not read the X-rays correctly. In the last analysis, however, the matter is unimportant. For, if the doctor was mistaken, as was the plaintiff, as to the existence of a permanent injury, we have a case of mutual mistake. If the mistake was only on the part of plaintiff, but was induced by the carelessness of Dr. Morrison, there was the type of mistake for which the cases just cited grant relief. See especially Great Northern R. Co. v. Fowler, supra; Great Northern R. Co. v. Reid, supra. If there was willfulness in the failure to disclose, we have a case of fraud. In any of the three situations, the broad terms of the release ("including any injuries which may hereafter develop") did not stand in the way of rescission. As said by District Judge Wolverton, speaking for

this Court, in Great Northern R. Co. v. Reid, supra, 245 F., at page 89: "The release itself is as broad as it could be made, acquitting the company of all liability arising on account of the injuries received by appellee, *whether then appearing or growing out of the same by development in the future, or arising or to arise out of any and all personal injuries sustained at any time or place while in the employ of the railway company prior to the date of the release.* In such a release, however, the general language will be held not to include a particular injury, *then unknown to both parties, of a character so serious as clearly to indicate that, if it had been known, the release would not have been signed.*" [Emphasis added.] [2]

The basis for the reasoning in these cases is that, regardless of the wording of the release, a settlement made without regard to an undisclosed physical condition cannot stand because "the settlement intended by both the parties was for the injuries and damages disclosed and then known by the parties." Southwest Pump & Machinery Co. v. Jones, supra, 87 F.2d, at page 881. And see Bonici v. Standard Oil Co., 1939, 2 Cir., 103 F.2d 437, 438–439.

The defendant in this case pleaded the release of October 1, 1945, as a defense. The plaintiff, without further pleading, was entitled to show that the signing of the release was induced by mistake or fraud. The plaintiff testified definitely that he did not, at the time the release was signed, believe that he had this injury to the spine; that he believed that his injuries were not serious and that, as urged by Dr. Morrison, he could and should go back to work as quickly as possible. The jury might well have believed that he would not have entered into this release had he been informed of the true nature of the injury which he had suffered and of its permanency. There is evidence in the record that the injury is traceable to the accident

---

[2] The California law on the subject is summed up in Union Pacific R. Co. v. Zimmer, supra, in this manner: "It is well settled, however, that the mere fact that the release is extremely comprehensive in terms, and purports to be a complete discharge from all claims arising out of the accident, and is understood as such by the releasor, will not prevent its avoidance where proper grounds therefor exist." 87 Cal.App.2d, at page 529, 197 P.2d at page 367.

and that it is of a permanent nature, requiring surgery to correct. The plaintiff had the right to have submitted to the jury, for their determination, these facts. As said by the court in Wilson v. San Francisco Oakland Terminal Railways, supra, 48 Cal.App., at page 349, 191 P., at page 978: ."The courts have frequently held in no uncertain terms that, where a release is tainted with fraud, it should not be sustained, and that the question of whether or not such taint exists is one to be submitted to and decided by the jury. In Kansas City M. & B. Ry. Co. v. Chiles, 86 Miss. 361, 38 So. 498, it was said: *'No release of this nature should be upheld if any element of fraud, deceit, oppression, or unconscionable advantage is connected with the transaction.* And in passing on the validity of such release, when assailed, all surrounding conditions should be fully developed, and the relative attitudes of the contracting parties clearly shown. So that the jury, in the clear light of the whole truth, may rightly decide which story bears the impress of verity.'" [Emphasis added.] [3]

This attitude accords with the views of this court, which considers even "an innocent misrepresentation of the facts of the releasor's injury, made by the releasee's physician," Great Northern R. Co. v. Fowler, 9 Cir., 136 F. 118, 121, as a ground for voiding a release induced by it.

In the light of these principles, we conclude that plaintiff's attack on the release presented a factual situation which called for determination by a jury.

III. The Rescission and Offer of Restitution Were Legally Sufficient and Timely.

The conclusion that the validity of the release presented a question of fact calls for the determination of the final question involved in this appeal, i. e., whether there was adequate and timely rescission* and offer of restitution.

■ Except where fraud enters into the execution of a release, rescission must be timely and a tender of the consideration received for the release must be made. Restatement, Restitution, § 65; Restatement, Contracts, §§ 349, 480; 17 C.J.S., Contracts, § 439; Miles v. Lavender, 9 Cir., 1926, 10 F.2d 450, 454; Irish v. Central Vermont Ry., 2 Cir., 1947, 164 F.2d 837, 840; Cal.Civil Code, § 1691; King v. Mortimer, 1948, 83 Cal.App.2d 153, 159, 188 P.2d 502.

■. It is argued that there was neither rescission nor offer of restitution. It is true that neither the notice of rescission nor the offer of restitution is before the court. They were enclosed in the letter of November, 25, 1945, the receipt of which was admitted in court by counsel for the defendant. The letter contains the following significant statement at the end of the second paragraph, which referred to the enclosed notice of rescission and offer to restore: "Kindly advise us of your wishes in this respect." It is quite evident that this statement called for action on the part of the defendant, if they intended to question the legal sufficiency of the notice and offer. In the absence of any objection, the plaintiff is entitled to the presumption that the documents referred to were legally sufficient to achieve the purpose intended. By failing to object, the defendant has waived the right to question the adequacy of the instruments. 17 C.J.S., Contracts, § 439, p. 924; Cal.Code of Civil Procedure, §§ 2074, 2076.[4]

The plaintiff testified that he had means of carrying into effect the offer—in other

---

[3] The Supreme Court of California in Jordan v. Guerra, supra, has adopted the quotation from Kansas City M. & B. Ry. Co. v. Chiles, supra, quoted in the excerpt just given as a proper statement of the law, which bids us scrutinize carefully releases in order to discover whether "the defendant has dealt fairly with the plaintiff." Jordan v. Guerra, 23 Cal. 2d 469, 477, 144 P.2d 349, 353.

[4] Apposite are the words of the Supreme Court of California in Backus v. Sessions, 1941, 17 Cal.2d 380, 390, 110 P. 2d 51, at page 56, "It is quite evident that the offer of rescission and to restore was not accepted by defendants. Apparently plaintiff heard nothing further from them after the offer was made; and after he commenced his action defendants claimed in their answer that the release was in full force and effect and a complete bar to plaintiff's action."

words, ability and willingness to perform. Cal.Civil Code, §§ 1493, 1495. We also have his statement that the offer was made in good faith. He added, under cross-examination: "I believe I could have gotten it together at the time if it had been demanded of me." He stated that his lawyer would have helped, and that he had property worth more than the amount and could have borrowed.

Grant that these statements may lack specificity, *yet they were not contradicted.* And we cannot brush them aside upon the assumption that they are of a character which the jury might not have believed.[5]

■ We are, therefore, of the view that the trial court erred in holding that the evidence showed, as a matter of law, that there was no valid rescission and offer of restitution.

■ We are also convinced that the question of the timeliness of the rescission should have been submitted to the jury. It is of the essence of rescission that it be timely. Lapse of time may destroy a person's ability to defend his position. He may have been induced by the belief in the validity of a release, to cease all endeavors to gather testimony to support his cause. And because equity takes these facts into consideration, it demands that he who rescinds a contract, be not guilty of laches in so doing. But, there is no hard and fast rule as to what lapse of time will amount to laches. Every case must be judged by the facts surrounding it. In re Meiselman, 2 Cir., 1939, 105 F.2d 995, 999; Johnson v. Umsted, 8 Cir., 1933, 64 F.2d 316, 323–324. See Furman v. Gulf Ins. Co., 8 Cir., 1946, 152 F.2d 891, 894–895; Austin v. Hallmark Oil Co., 1943, 21 Cal.2d 718, 134 P.2d 777, 786.

On the whole, courts are very liberal in the matter. In Komer v. Shipley, 5 Cir., 1946, 154 F.2d 861, 866, cited by the de-fendant, we find this statement of the rule: "Whether a ratification resulted from the retention of the amount paid on the execution of a release has been held to be a question for the jury. See cases cited 76 A.L.R. at page 349. With consideration of plaintiff's difficulty in employing legal counsel the court below did not err in holding that a retention of the amount paid for more than one year was not unreasonable, hence did not amount to a ratification."

In that case more than a year elapsed before any attempt to rescind or restore the consideration was made. This Court, in Robert Hind, Ltd., v. Silva, supra, ruled that, in the absence of a showing of detriment, a delay of nearly two years presented a question of fact. Judge Wilbur wrote [75 F.2d 78]: "Moreover, it is not shown that the delay in bringing the suit has worked any prejudice or disadvantage to appellant, and it is well settled that 'mere delay in asserting a right does not ipso facto bar its enforcement in equity, by the great weight of authority, unless the case is barred by the statute of limitations.' "

■ There was no showing of change of position or injury resulting from the delay. And, mere delay without injury does not constitute laches which bars recovery. Robert Hind, Ltd., v. Silva, supra; Allen v. California Mutual Bldg. & Loan Ass'n, 1943, 22 Cal.2d 474, 488, 139 P.2d 321, 329.

The plaintiff was entitled to have the facts relating to the timeliness of the rescission submitted to the jury. See Brown v. Pennsylvania Ry. Co., 2 Cir., 1947, 158 F.2d 795; Carr v. Sacramento Clay Products Co., 1917, 35 Cal.App. 439, 170 P. 446; O'Meara v. Haiden, supra.

The trial court having erred in granting the motion for a directed verdict, the judgment on the verdict in favor of the defendant is reversed and a new trial is ordered.

---

[5] We are in the same position as the Supreme Court of California was in Backus v. Sessions, supra, when it used the language quoted in note 3 in reaching the conclusion that when the evidence showed that the defendant had certain assets convertible into cash and borrowing facilities, it could not be said that he was "unable or unwilling" to restore the consideration received. 17 Cal.2d 389-390, 110 P.2d at page 56.